FILED

2012 Sep-04  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **Michael E. Weaver,**<br><br>Plaintiff,<br><br>vs.<br><br>**Madison City Board of Education,** a local education authority ; and **Dr. Dee Fowler,** in his official capacity as Superintendent of Education of Madison City Schools,<br><br>Defendants. | Civil Action No.<br>5:11-cv-03558-TMP |

# Plaintiff's Opposition to "Motion to Dismiss or, in the Alternative, Motion for Judgment on the Pleadings Based on Lack of Subject Matter Jurisdiction" (Doc. 17)

## Contents

I.   Introduction. .......................................................................8
II.   The Court Has Subject Matter Jurisdiction over This Lawsuit. .....9
   A.   The Court Must Apply a Liberal Construction to USERRA. ........9
   B.   Defendants Are a "Private Employer" for Purposes of
Jurisdiction Under USERRA.................................................11
   C.   Alabama Is Not Weaver's Employer. ...........................18
   D.   Even If Defendants Were a State Employer, Federal Courts
Would Have Jurisdiction over Weaver's Claims. ...............21
III.   States Have No Immunity to Private Suits Authorized by Congress
Under Its War Powers..........................................................24
   A.   Congress Enacted USERRA Pursuant to Its War Powers.........24
   B.   Congress Can Subject States to Private Suits Pursuant to Its
War Powers. .....................................................................27
   C.   Congress Validly Exercised Its War Powers in Authorizing
Private Suits Against States Under USERRA....................34
IV.   Even if the Eleventh Amendment Applied to USERRA Cases, the
Board Would Not Be Immune from Liability. .......................38
   A.   The Madison City Board of Education Has the Burden of
Establishing Its Status as an Arm of the State. ...............38
   B.   The "Twin Reasons" for Eleventh Amendment Immunity.........40
   C.   The *Manders* Test. ...........................................41
   D.   Does State Law Define a City Board of Education as an Arm of
the State? ........................................................................51
   E.   Does Alabama Law Define Public Officials, Such as Supt. Fowler
and the Board Members, as Arms of the State? ................53
   F.   What "Functions" Are the Defendants Performing Relative to the
Issues in This Case?..........................................................56
   G.   What Degree of Control Does the State Maintain over a City
Board of Education and Superintendent?...........................58
   H.   Whence Cometh the Local School System's Funds?.................60
   I.   Who is Financially Responsible for Judgments Against the Local
Board or Superintendent? ...................................................62
V.   Even if the Eleventh Amendment Were Applicable, Weaver Could
Still Seek Prospective Injunctive Relief................................64
VI.   Conclusion. ...................................................................65

Table of Authorities

**Cases**

*Abusaid v. Hillsborough County Bd. of County Com'rs,* 405 F.3d 1298 (11th Cir. 2005) ...................................................................... 53, 54, 59

*Adams v. Rankin County Bd. of Educ.,* 524 F.2d 928 (5th Cir.1975) (per curiam) ............................................................................... 43, 45

*Alabama Dept. of Transp. v. Harbert Intern., Inc.,* 990 So.2d 831 (Ala. 2008) ....................................................................................... 55

*Alabama Power Co. v. Davis*, 431 U.S. 581 (1977) ........................... 11, 36

*Aland v. Graham*, 287 Ala. 226, 250 So.2d 677 (1971) ......................... 55

*Alden v. Maine*, 527 U.S. 706 (1999) ........................................ 28, 29, 38

*Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728 (7th Cir.1994) .............. 40

*Bedrossian v. Northwestern Memorial Hosp.,* 409 F.3d 840 (7th Cir. 2005) ...................................................................................... 27

*Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323 (11th Cir. 2003) .... 16

*Board of School Comm'rs  of Mobile County v. Biggs*, 939 So.2d 942 (Ala. Civ. App. 2006) ........................................................................ 18

*Board of Sup'rs of Louisiana State University and Agr. and Mechanical College v. Ludley*, 252 F.2d 372 (5th Cir. 1958) ............................... 64

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) .................. 36

*Burr & Forman v. Blair*, 470 F.3d 1019 (11th Cir. 2006) ..................... 22

*Camacho v. Public Svc. Com. of Commonwealth of Puerto Rico,* 450 F.Supp. 231 (D.P.R. 1978) ......................................................... 37

*Campbell v. Gadsden County Dist. School Bd.,* 534 F.2d 650 (5th Cir.1976) ................................................................................. 43

*Cannon v. University of Chicago*, 441 U.S. 677 (1979) ........................ 25

*Central Virginia Community College v. Katz,* 546 U.S. 356 (2006) . 28, 29

*Chance v. Dallas County Hosp. Dist.*, 176 F.3d 294 (5th Cir. 1999) ...... 12

*Christy v. Pa. Turnpike Comm'n,* 54 F.3d 1140 (3d Cir.1995) .............. 40

*Clegg v. Arkansas Dep't of Corrections*, 2006 WL 1730774 (E.D. Ark. 2006), *aff'd*, 496 F.3d 922 (8th Cir. 2007) ..................................... 23

*Coffy v. Republic Steel Corp.*, 447 U.S. 191 (1980) ............................ 11

*Colbert County Bd. of Educ. v. James,* 83 So.3d 473 (Ala. 2011) .......... 54

*Colonial Pipeline Co. v. Collins,* 921 F.2d 1237 (11th Cir. 1991) .......... 41

*Davis v. Advocate Health Center Patient Care Express*, 523 F.3d 681 (7th Cir. 2008) ......................................................................... 11

*Dees v. Coaker,* 51 So.3d 323 (Ala.Civ.App. 2009) .............................54, 55

*Diaz-Gandia v. Dapena-Thompson,* 90 F.3d 609 (1st Cir. 1996) ...........37

*Drummond Co. v. Alabama Dep't of Transp.,* 937 So.2d 56 (Ala.2006) .56

*Edelman v. Jordan,* 415 U.S. 651 (1974) .........................................63, 64

*Evatt v. Thomas,* --- So.3d ----, 2012 WL 2362634 (Ala.Civ.App. 2012) .55

*Ex parte Bessemer Bd. of Educ.,* 68 So.3d 782 (Ala. 2011) ..............53, 55

*Ex parte Hale County Bd. of Educ.,* 14 So.3d 844 (Ala.2009) .................53

*Ex parte Madison Co. Bd. of Educ.,* 1 So.3d 980 (Ala. 2008) ...........47, 51

*Ex parte Young,* 209 U.S. 123 (1908) ....................................................66

*Federal Maritime Com'n v. South Carolina State Ports Authority,* 535 U.S. 743 (2002) ...............................................................................41, 42

*Fishgold v. Sullivan Drydock and Repair Corp.,* 328 U.S. 275 (1946) ..10

*Francis v. Booz, Allen & Hamilton, Inc.,* 452 F.3d 299 (4th Cir. 2006) .36

*Gordan v. Cochran,* 116 F.3d 1438 (11th Cir. 1997) .............................53

*Gordon v. Wawa, Inc.,* 388 F.3d 78 (3d Cir. 2004) .................................12

*Gragg v. Ky. Cabinet for Workforce Dev.,* 289 F.3d 958 (6th Cir.2002)..40

*Hess v. Port Authority Trans-Hudson Corp.,* 513 U.S. 30 (1994).....41, 42

*Hill v. Michelin North America, Inc.,* 252 F.3d 307 (4th Cir. 2001).......11

*In re Tarble,* 80 U.S. 397 (1871) .......................................................32, 34

*ITSI TV Prods., Inc. v. Agric. Ass'ns.,* 3 F.3d 1289 (9th Cir.1993).........40

*Jennings v. Illinois Office of Ed.,* 589 F.2d 935 (7th Cir. 1979) .............37

*Johnson v. Ogeechee Behavioral Health Services,* 479 F.Supp.2d 1357 (S.D. Ga. 2007) .....................................................................................52

*King v. St. Vincent's Hospital,* 502 U.S. 215 (1991)................................11

*Larkins v. Department of Mental Health and Mental Retardation,* 806 So. 2d 358 (Ala. 2001) ...........................................................................23

*Lichter v. U.S.,* 334 U.S. 742 (1948)................................................34, 35

*Majd-Pour v. Georgiana Community Hosp., Inc.,* 724 F.2d 901 (11th Cir. 1984)......................................................................................................40

*McMillian v. Monroe County, Ala.,* 520 U.S. 781 (1997) .................52, 65

*Miccosukee Tribe of Indians v. Florida State Athletic Commission,* 226 F.3d 1226 (11th Cir.2000)...................................................................51

*Mobile, Alabama-Pensacola, Florida Bldg. & Constr. Trades Council v. Williams,* 331 So.2d 647 (Ala.1976)...................................................50

*Moore v. State of Kansas,* 1979 WL 1866 (D. Kan. 1979) ......................37

*Moore v. Tangipahoa Parish School Bd.,* 594 F.2d 489 (5th Cir.1979)..43

*Morrison v. Allstate Indem. Co.,* 228 F.3d 1255 (11th Cir. 2000)...........40

*Mt. Healthy Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977) ................. passim

4

*Opinion of the Justices,* 276 Ala. 239, 160 So.2d 648(1964) ............. 46, 49

*Palmatier v. Michigan Dep't of State Police,* 981 F.Supp. 529 (W.D. Mich. 1997)...................................................................................28

*Peel v. Florida Dep't of Trans.,* 600 F.2d 1070 (5th Cir. 1979)......... 36, 37

*Port Authority Trans–Hudson Corp. v. Feeney,* 495 U.S. 299  (1990)....41

*Reopell v. Commonwealth of Mass.,* 936 F.2d 12 (1st Cir. 1991) ...........37

*Risner v. Ohio Dept. of Rehabilitation and Correction,* 577 F.Supp.2d 953 (N.D. Ohio 2008) .........................................................................27

*Sandoval v. City of Chicago, Ill.,* 560 F.3d 703 (7th Cir. 2009)..............13

*Schiff v. Williams,* 519 F.2d 257 (5th Cir. 1975) ............................... 64, 65

*Seminole Tribe of Fla. v. Florida,* 517 U.S. 44 (1996) ............... 28, 29, 37

*Shands Teaching Hosp. & Clinics v. Beech St. Corp.,* 208 F.3d 1308 (11th Cir.2000) .................................................................................60

*Sheely v. Idaho Falls School Dist. No. 91,* 1978 WL 1667 (D. Idaho 1978) ..........................................................................................................37

*Shoals Community College v. Colagross,* 674 So.2d 1311 (Ala.Civ.App. 1995)....................................................................................................54

*Skelton v. Camp,* 234 F.3d 292 (5th Cir.2000).......................................40

*State v. Tuscaloosa County,* 233 Ala. 611, 172 So. 892 (1937) ..............50

*Stewart v. Baldwin Co. Bd. of Educ.,* 908 F.2d 1499 (11th Cir. 1990)..42, 44, 64

*Townsend v. University of Alaska,* 543 F.3d 478 (2008).........................23

*Travelers Indemnity Co. v. School Bd. of Dade County,* 666 F.2d 505 (11th Cir.1982) ....................................................................... 43, 63, 64

*United States v. Alabama Dep't of Mental Health and Mental Retardation* ......................................................................................38

*United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304 (1936) ......29

*United States v. Morton,* 467 U.S. 822 (1984)........................................22

*Vandenberg v. Aramark Educ. Servs., Inc.,* 81 So.3d 326 (Ala.2011) ....53

*Velasquez v. Frapwell,* 165 F.3d 593 (7th Cir. 1999).......................23, 30

*Versiglio v. Board of Dental Examiners of Alabama,* 651 F.3d 1272 (2011), *vacated and superseded on reh'g,* 686 F.3d 1290 (11th Cir. 2012).............................................................................................51, 52

*Virginia Office for Protection and Advocacy v. Stewart,* __ U.S. __, 131 S.Ct. 1632, 179 L.Ed.2d 675 (2011) ..................................................66

*Wachovia Bank v. Schmidt,* 546 U.S. 303 (2006) ..................................22

*Wojcik v. Massachusetts State Lottery Com'n,* 300 F.3d 92 (1st Cir. 2002) ..........................................................................................................40

*Woods v. Rondout Valley Central School Dist. Bd of Educ.,* 466 F.3d 232
    (2nd Cir. 2006) ................................................................................... 40


**Statutes**

28 U.S.C. § 1331 ........................................................................................ 23
38 U.S.C. § 4301 ..................................................................... 12, 26, 35
38 U.S.C. § 4311 ........................................................................................ 27
38 U.S.C. § 4313 ............................................................................... 27, 66
38 U.S.C. § 4314 ........................................................................................ 27
38 U.S.C. § 4316 ........................................................................................ 27
38 U.S.C. § 4317 ........................................................................................ 27
38 U.S.C. § 4318 ........................................................................................ 27
38 U.S.C. § 4323 ........................................................................... passim
Ala. Code § 1-1-13 ................................................................................... 16
Ala. Code § 13A-10-1 (2011 Cumm. Supp.)................................. 17
Ala. Code § 16-11-11 ................................................................................ 15
Ala. Code § 16-11-12 ....................................................................... 14, 16
Ala. Code § 16-11-13 ................................................................................ 16
Ala. Code § 16-11-17 ................................................................................ 19
Ala. Code § 16-11-2 ........................................................................ 14, 46
Ala. Code § 16-11-3 ............................................................... 14, 46, 52
Ala. Code § 16-11-9 ............................................................... 14, 15, 46
Ala. Code § 16-12-1 (2011 Cumm. Supp.) ............................... 15
Ala. Code § 16-12-16................................................................................ 20
Ala. Code § 16-12-3................................................................................... 15
Ala. Code § 16-12-9................................................................................... 16
Ala. Code § 16-13-140.............................................................................. 45
Ala. Code § 16-13-143.............................................................................. 45
Ala. Code § 16-13-145.............................................................................. 45
Ala. Code § 16-13-211.............................................................................. 45
Ala. Code § 16-13-260.............................................................................. 17
Ala. Code § 16-13-32................................................................................ 44
Ala. Code § 16-13-37................................................................................ 45
Ala. Code § 16-13-70................................................................................ 44
Ala. Code § 16-13-76................................................................................ 44
Ala. Code § 16-13A-4 (2011 Cumm. Supp.)................. 20, 57, 60
Ala. Code § 16-13A-5 (2011 Cumm. Supp.).................... 20, 57

Ala. Code § 16-13A-6 (2011 Cumm. Supp.)..............................................45
Ala. Code § 16-8-1.........................................................................46, 47
Ala. Code § 16-8-10............................................................................46
Ala. Code § 16-8-28............................................................................46
Ala. Code § 16-8-5..............................................................................46
Ala. Code § 16-8-8.........................................................................46, 48
Ala. Code § 16-8-9..............................................................................46
Ala. Code § 36-28-1............................................................................17
Ala. Code § 41-22-3............................................................................18
Ala. Code §§ 31-12-1 *et seq.* (2011 Cumm. Supp.) ................................57
Pub. L. No. 105-368............................................................................13
Pub. L. No. 110-389............................................................................13

## Constitutional Provisions

Alabama Constitution of 1901, art. 1 § 14......................................23, 51
Articles of Confederation, art. 6...........................................................30
Articles of Confederation, art. 9...........................................................30
U.S. Const. art. I, § 10, cl. 3 ..............................................................32
U.S. Const. art. I, § 8, cl. 1 ...............................................................26
U.S. Const. art. I, § 8, cl. 11 .......................................................26, 28
U.S. Const. art. I, § 8, cl. 15 ..............................................................26
U.S. Const. art. I, § 8, cl. 18 ..............................................................25

## Other Authorities

20 C.F.R. § 1002.39 ...........................................................................18
Department of Labor, Preamble to USERRA Final Rules, 70 Fed. Reg.
  75,246 (Dec. 19, 2005)..............................................................11, 18
H.R. Rep. No. 103-65, pt. 1 (1993) ...............................................11, 36
Harner, *The Soldier and the State: Whether the Abrogation of State
  Sovereign Immunity in USERRA Enforcement Actions Is a Valid
  Exercise of the Congressional War Powers,* 195 Mil.L.Rev. 91 (2008) 37
Hirsch, *Can Congress Use its War Powers to Protect Military Employees
  from State Sovereign Immunity?,* 34 Seton Hall L.Rev. 999 (2004) ..30,
  33
S. Rep. No. 103-158 (1993) ........................................................11, 36
The Federalist No. 23...........................................................................33
The Federalist No. 32......................................................................31, 32

**Introduction.**

> "[N]o one who fights for this country should have to
> fight for a job or a roof over their head when they come
> home. . . . That's how we can honor our troops.  That's
> the welcome home they've earned." President Obama,
> Weekly Address, 1 September 2012.[1]

As more fully set out in Michael Weaver's Motion for Partial
Summary Judgment (Doc. 16 and its attachments), this is an action
under the Uniformed Services Employment and Reemployment Rights
Act (USERRA). Weaver is alleging that Defendants unlawfully failed to
reemploy him in the reemployment position required by USERRA, and
instead placed him into a position with inferior status and pay, when he
returned from active military duty.

Rather than litigating the merits of Weaver's USERRA claims,
Defendants have moved to dismiss this lawsuit on alleged grounds of
lack of subject matter jurisdiction and sovereign immunity. (Doc. 19.)
However, Defendants' motion must be denied because § 4323(b)(3) of
USERRA confers subject matter jurisdiction over this lawsuit; sovereign
immunity is not available as a defense to claims under USERRA; even
if sovereign immunity were a viable defense to USERRA claims,
Defendants could not claim such immunity because they are not an arm
of the state; and even if sovereign immunity were applicable, Weaver

---

[1] President, Barack Obama, "Weekly Address: Honoring Our Nation's
Service Members and Military Families,"
http://www.whitehouse.gov/the-press-office/2012/09/01/weekly-address-honoring-our-nation-s-service-members-and-military-famili.

still could proceed on his claims for prospective injunctive relief against Defendant Dr. Dee Fowler in Dr. Fowler's official capacity.

## I.   The Court Has Subject Matter Jurisdiction over This Lawsuit.

Contrary to the contentions of Defendants Madison City Board of Education ("the Board") and Defendant Superintendent of Madison City Schools Dee Fowler in his official capacity ("Superintendent Fowler"), the Court has subject matter jurisdiction over Michael Weaver's claims under USERRA. As argued fully below, the Board (collectively with Superintendent Fowler) is considered a private employer for purposes of enforcement under USERRA; the Board, and not the State of Alabama, is Weaver's employer; and even if the State were Weaver's employer, federal jurisdiction would remain.

### A.   The Court Must Apply a Liberal Construction to USERRA.

Resolution of whether the Court has subject matter jurisdiction over Weaver's claims involves interpretation of USERRA's jurisdictional provisions. Weaver respectfully submits that a liberal rule of construction should guide the analysis if the Act's language is unclear. Construing rights under USERRA's predecessor legislation, the Supreme Court held in *Fishgold v. Sullivan Drydock and Repair Corp.*, 328 U.S. 275, 285 (1946), that "[t]his legislation is to be liberally construed for the benefit of those who left private life to serve their

country in its hour of great need," a sentiment the high court reaffirmed on multiple occasions thereafter. *See Coffy v. Republic Steel Corp.*, 447 U.S. 191, 196 (1980); *Alabama Power Co. v. Davis*, 431 U.S. 581, 584-85 (1977); *King v. St. Vincent's Hospital*, 502 U.S. 215, 221 n.9 (1991). House and Senate committee reports affirm Congress's explicit intent to retain the same approach when construing the language of USERRA. *See* H.R. Rep. No. 103-65, pt. 1, at 19 (1993), *as reprinted in* 1994 U.S.C.C.A.N. 2449, 2452 (rule of liberal construction "remains in full force and effect" for cases under USERRA); S. Rep. No. 103-158, at 40 (1993) (principle that reemployment rights be liberally construed to "remain in full force and effect"). The United States Department of Labor adheres to the liberal rule of construction in interpreting USERRA. *See* Department of Labor, Preamble to USERRA Final Rules, 70 Fed. Reg. 75,246 (Dec. 19, 2005) ("The Department intends that this interpretive maxim apply with full force and effect in construing USERRA and [the USERRA] regulations."). Further, the federal courts have consistently recognized the rule of liberal construction applicable to servicemembers' rights under USERRA. *See, e.g., Hill v. Michelin North America, Inc.*, 252 F.3d 307, 313-14 (4th Cir. 2001) ("Because USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries."); *Davis v. Advocate Health Center Patient Care Express*, 523 F.3d 681, 683-84 (7th Cir. 2008) ("We . . . construe USERRA liberally in favor of veterans seeking its protections."); *Gordon*

10

*v. Wawa, Inc.*, 388 F.3d 78, 81 (3d Cir. 2004) ("we construe USERRA's provisions liberally, in favor of the service member"); *Chance v. Dallas County Hosp. Dist.*, 176 F.3d 294, 297 n.14 (5th Cir. 1999) ("The legislative history does reveal that the USERRA is to be 'liberally construed.'").

The Act's stated purposes inform construction of the Act as well. Those purposes are to "encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service"; "minimize the disruption to the lives of" servicemembers by providing for their prompt reemployment upon completion of service; and prohibit discrimination against servicemembers. 38 U.S.C. § 4301(a).

    B.    Defendants Are a "Private Employer" for Purposes of Jurisdiction Under USERRA.

USERRA confers on this Court subject matter jurisdiction over Plaintiff's claims. 38 U.S.C. § 4323(b)(3), (i). Defendants seriously err in contending that "[t]he court "lacks subject matter jurisdiction over this action" because they are "a state agency within the meaning of [USERRA]" and, thus, subject matter jurisdiction lies with the state courts under § 4323(b)(2) of USERRA (Def. Mem.  (Doc 19) at 3[2]). Section 4323(b)(2) provides: "In the case of an action against a State (as

---

[2]Citations herein to pages of documents electronically filed with the Court are to the page numbers assigned and printed by the CM/ECF system.

an employer) by a person, the action may be brought in a State court of competent jurisdiction in accordance with the laws of the State." However, contrary to Defendants' argument, § 4323(b)(2) is not the relevant jurisdictional provision of USERRA for this case. Rather, another provision governs jurisdiction of Weaver's USERRA claims: § 4323(b)(3).

Section 4323(b)(3) provides that "[i]n the case of an action against a private employer by a person, the district courts of the United States **shall** have jurisdiction of the action." (Emphasis added.) While at first blush, § 4323(b)(3) appears inapplicable to suits against public employers, reference to § 4323(i)[3] shows otherwise. Section 4323(i) provides that as used in § 4323, "the term 'private employer' includes a political subdivision of a State." Therefore, § 4323(b)(3) places with the federal courts subject matter jurisdiction over USERRA claims against political subdivisions of states. By contrast, § 4323(b)(2) "concerns only suits against states themselves." *Sandoval v. City of Chicago, Ill.*, 560 F.3d 703, 704 (7th Cir. 2009).

The Board is a political subdivision of Alabama within the meaning of § 4323(i). From the standpoint of the plain meaning of "political subdivision of a State"—a separate legal unit of a state that performs local governmental functions within a particular geographic area—city boards of education such as the Board so qualify. Alabama

---

[3] When originally enacted, this provision was codified as § 4323(j). *See* Pub. L. No. 105-368, § 211(a). In 2008, § 4323(j) was redesignated as §4323(i). Pub. L. No. 110-389, § 311(f)(3)(b).

city school boards have local governmental functions of administration and management of public schools within Alabama cities having city public school systems. *See* Ala. Code § 16-11-2(b) ("The general administration and supervision of the public schools and educational interest of each city shall be vested in a city board of education[.]"); Ala. Code § 16-11-9 ("The city board of education is vested with all the powers necessary or proper for the administration and management of the free public schools within such city and adjacent territory to the city which has been annexed as a part of the school district which includes a city have a board of education.").

City boards of education are intertwined with the cities they serve, including the following:

- By their official names, the Board and other city boards of education in Alabama, hold themselves out as city, rather than state, entities.

- The governing body of a city elects the members of the city's board of education. *See* Ala. Code § 16-11-3.

- Contracts made by the city board "inure to the benefit of the public schools, and any action brought upon them and for the recovery and protection of money and property belonging to and used by the public schools, or for damages, shall be brought **by and in the name of the city**." Ala. Code § 16-11-12 (emphasis added).

13

- Although a city school board is not authorized to directly call an election to issue bonds, upon the city school superintendent's recommendation, the board may petition the city's council or commission to call such an election to issue bonds on the credit of the city. Ala. Code § 16-11-19. The council or commission must then call the election at the time requested in the petition. *Id.*

- A city board of education may enter into cooperative agreements, projects, and programs with the city's governing body, and take other actions it deems necessary for proper management of the public schools. Ala. Code § 16-11-9.1.

Other indicia of city boards' of education status as political subdivisions of the state include, but are not limited to, the following:

- City boards of education, and not the state, appoint the respective city superintendents of schools. *See* Ala. Code § 16-12-1(a) (2011 Cumm. Supp.).

- A city superintendent of schools is "the chief executive officer of the city board of education," Ala. Code § 16-12-3(a), not a state official.

- A city board of education holds all school property in trust for the city's public schools. Ala. Code § 16-11-11.

- City boards of education "have full and exclusive rights . . . to purchase real estate, furniture, appropriated libraries, fuel and supplies for the use of the public schools, and to sell the same," as

14

well as "to make necessary and proper notes, contracts and agreements in relation to such matters." Ala. Code § 16-11-12.

- A city board of education has full and exclusive rights to establish and build new schools, purchase sites for the new schools, and supervise building new schools. *Id.* (*See* Exhibit 1, Weaver Decl., ¶¶ 21-22.)

- City boards of education are empowered to institute condemnation proceedings. Ala. Code § 16-11-13. *See Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1326 (11th Cir. 2003) (noting that "[t]he power of eminent domain is a sovereign power").

- Upon the recommendation of the city superintendent of schools, a city board of education must employ such professional, clerical, accounting and statistical assistants as, in the judgment of the board, are necessary. Ala. Code § 16-12-9.

- Each city board of education sets employees' salaries and may suspend or discharge employees upon the recommendation of the city superintendent of schools. Ala. Code 16-11-17. Further, a city's superintendent of schools "hold[s] office at the pleasure of the board" and "receive[s] such compensation as the city board of education shall direct." Ala. Code 16-12-1(a) (2011 Cumm. Supp.). (*See* Weaver Decl. ¶ 18.)

Significantly, Alabama characterizes city boards of education as "political subdivisions." *See, e.g.*, Ala. Code § 1-1-13 ("The omission from this Code of any acts heretofore passed which validated any bonds,

15

notes, warrants, certificates or other evidences of indebtedness issued by any city, town, county, county board of education, **city board of education or other political subdivision of the state** shall in no way operate or be construed to repeal or destroy the effect of any and all of such validating acts where said validating acts have been otherwise lawfully passed and are not in conflict with the Constitution of the United States or the State of Alabama.") (emphasis added); Ala. Code § 13A-10-1(2) (2011 Cumm. Supp.) (defining "government" as "[t]**he state, county, municipality, or other political subdivision thereof, including public county and city boards of education**, the youth services department district, the Alabama Institute for Deaf and Blind, and all educational institutions under the auspices of the State Board of Education") (emphasis added);  Ala. Code § 16-13-260(2) ("**Counties, municipalities, boards of education, and other political subdivisions** frequently realize substantial debt service savings and other benefits through the issuance and sale of refunding obligations to provide for the payment and retirement of previously issued bonds, warrants, or other obligations.") (emphasis added); Ala. Code § 36-28-1(5) (defining "political subdivision" as "[a]ny county, municipal corporation, **school district or other equivalent governmental entity"**) (emphasis added).

Alabama does not classify city boards of education as state agencies. For instance, the list of Alabama state agencies at the state's

website[4] does not include any city or county boards of education. Nor are local boards of education such as Defendant considered state agencies under the Alabama Administrative Procedure Act, Ala. Code § 41-22-1 et seq. *See* § 41-22-3(1) (exempting "counties, municipalities, or any agencies of local governmental units" from AAPA's definition of "agency"); *Board of School Comm'rs of Mobile County v. Biggs*, 939 So.2d 942, 947 (Ala. Civ. App. 2006) (holding school board "is a local agency; it is not a state agency subject to the application of the AAPA").

Importantly, too, the U.S. Department of Labor treats school districts as political subdivisions within the meaning of USERRA. *See* 20 C.F.R. § 1002.39 (noting that "States and their political subdivisions, such as counties, parishes, cities, towns, villages, and **school districts**, are considered employers under USERRA") (emphasis added); U.S. Dep't of Labor, preamble to USERRA regulations, 70 Fed. Reg. 75,246, 75,286 (Dec. 19, 2005) (noting that under § 4323 of USERRA, "[t]he political subdivisions of a State (counties, municipalities and **school districts**) . . . are private employers for enforcement purposes") (emphasis added).

In light of the numerous factors addressed in the preceding discussion, it is abundantly clear the Board is a political subdivision within the meaning of § 4323(i) of USERRA and thus a private employer under § 4323(b)(3). To the extent any shadow of a doubt

---

[4] http://info.alabama.gov/directory.aspx?range=2, last visited Aug. 23, 2012.

remains whether the Madison City School Board so qualifies, application of the canon of construction that the Act be construed liberally for the benefit servicemembers and veterans tips the scales decidedly in favor of federal jurisdiction over Weaver's claims.

> C.     Alabama Is Not Weaver's Employer.

Besides the Board's qualification as a political subdivision of the state and therefore a private employer for purposes of federal court jurisdiction under § 4323(b)(3), the fact that the Board, and not Alabama, is Weaver's employer further renders § 4323(b)(2) inapplicable to Weaver's suit. Section 4323(b)(2), by its terms, applies only to "an action against a State (**as an employer**) by a person." (Emphasis added.) The absence of an employer-employee relationship between a USERRA plaintiff and a state renders § 4323(b)(2) inapplicable to such plaintiff's lawsuit.

It is clear that the Board is the employer of employees in the Madison City public school system within the meaning of USERRA. USERRA broadly defines "employer" as "any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities." 38 U.S.C. § 4303(4). The Board pays the salary and wages of employees of Madison City Schools: The Board fixes the salaries of all employees, s*ee* Ala. Code § 16-11-17; payroll is prepared by personnel in the business office for Madison City Schools and reviewed by the CSFO (s*ee* Weaver

Decl., ¶ 13); paychecks are drawn from the Board's bank account (s*ee id.*); Superintendent Fowler signs the paychecks (s*ee id.*). No state official handles or approves this payroll. (*See id.*) The Board is the employer named on W-2 forms issued to employees of the Madison City Schools. (Weaver Decl., ¶ 6.)

The Board also has control over employment opportunities. The Board hires employees of the Madison City Schools upon the recommendation of its CEO, Superintendent Fowler. *See* Ala. Code § 16-12-16; Weaver Decl., ¶ 4. Similarly, the Board fires employees upon Superintendent Fowler's recommendation, *see* Ala. Code 16-11-16; Weaver Decl., ¶ 4, although it can unilaterally discharge the Chief School Financial Officer (CSFO), *see* Ala. Code § 16-13A-4(c) (2011 Cumm. Supp.); Weaver Decl., ¶ 9. Besides his authority to recommend hiring of the CSFO, Superintendent Fowler is the CSFO's supervisor and exercises further control over employment opportunities of the CSFO (who is Weaver). *See* Ala. Code § 16-13A-5(a) (2011 Cumm. Supp.) (stating that "[t]chief school financial officer shall work under the direct supervision of the local superintendent of education"); Weaver Decl., ¶¶ 9, 14. Superintendent Fowler's control over employment opportunities is evident as well through his powers to assign employees their positions, transfer them, suspend them, and recommend them for promotion. *See* Ala. Code § 16-12-16.

Weaver makes crystal clear in his declaration the reality his employment relationship is with the Board and Superintendent, and

not Alabama. The Board hired Weaver upon the recommendation of the former Superintendent of Madison City Schools. (Weaver Decl., ¶ 10.) The state did not hire Weaver for any position he has held with the Board. (Weaver Decl., ¶ 6.) Weaver's workplace is on property of the Madison City Board of Education, and not state property. (Weaver Decl., ¶ 9.) The state never directed or supervised Weaver's work; rather, Superintendents of Madison City Schools always have supervised Weaver. (Weaver Decl., ¶¶ 9, 14.) The Board, not the state, sets Weaver's pay, issues Weaver's pay checks, and issues Weaver's W-2 forms. (Weaver Decl., ¶¶ 6, 12-13.) The state legislature does not appropriate funds for Weaver's salary. (Weaver Decl., ¶¶ 17, 19.) When Weaver returns from military service, he seeks reemployment under § 4312(e)(1) of USERRA by notifying the Board's CEO, Superintendent Fowler, not the state. (Weaver Decl., ¶ 7.) Furthermore and crucially, Defendants, not the state, made the decisions concerning Weaver's reemployment—including Weaver's post-reemployment title, responsibilities, authority, pay, and office location—that Weaver is challenging as violative of USERRA. (*See* Complaint (Doc. 1), ¶¶ 17-18, 21; Weaver Decl., ¶¶ 8, 12, 28-30.)

Because the Board is Weaver's employer, and because the Board is a private employer within the meaning of § 4323(b)(3) of USERRA, § 4323(b)(2) does not govern subject matter jurisdiction over Weaver's claims. Instead, subject matter jurisdiction squarely lies with the Court under § 4323(b)(3).

D.     Even If Defendants Were a State Employer, Federal
       Courts Would Have Jurisdiction over Weaver's Claims.

As argued above, Weaver does not concede the Defendants are state employers for enforcement under § 4323 of USERRA. However, Weaver notes that even if Defendants were a state employer, subject matter jurisdiction over Weaver's claims would still lie with the Court, and not with the Alabama state courts. The pertinent language of § 4323(b)(2) is the permissive term "may" and the authorization to sue only in a state court "of competent jurisdiction."

Taking the latter term first, there is no state court of competent jurisdiction in Alabama in which a plaintiff could sue a state agency under USERRA. "Competent jurisdiction" usually is synonymous with subject matter jurisdiction. *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006) (noting that "[s]ubject-matter jurisdiction . . . concerns a court's competence to adjudicate a particular category of cases"); *United States v. Morton*, 467 U.S. 822, 828 (1984) (observing that "[s]ubject-matter jurisdiction defines the court's authority to hear a given type of case"); *Burr & Forman v. Blair*, 470 F.3d 1019, 1034 (11th Cir. 2006) (finding lower court's order "was not entered by a court of competent jurisdiction" because "the court lacked subject matter jurisdiction to issue it"). Alabama state courts are not courts of competent jurisdiction to hear a USERRA claim against a state employer because the Alabama Supreme Court has ruled that Article I, Section 14 of the Alabama

21

Constitution of 1901[5] immunizes Alabama from suits under USERRA filed in state court in Alabama and operates as a jurisdictional bar to such lawsuits. *Larkins v. Department of Mental Health and Mental Retardation*, 806 So. 2d 358, 363-64 (Ala. 2001).

However, the absence of any state court of competent jurisdiction in Alabama in which state employees can bring USERRA claims against state employers does not mean such employees are automatically foreclosed from bringing their claims in federal court. The permissive term "may" in § 4323(b)(2), rather than the mandatory term "shall," conveys that state courts are not the exclusive fora for state employees' USERRA claims against state employers, and that such employees may invoke federal jurisdiction under other applicable provisions of law, such as federal question jurisdiction under 28 U.S.C. § 1331. *See Clegg v. Arkansas Dep't of Corrections*, 2006 WL 1730774, at *5 & n.52 (E.D.  Ark. 2006), *aff'd*, 496 F.3d 922 (8th Cir. 2007). *But see Townsend v. University of Alaska*, 543 F.3d 478, 482-84 (2008); *McIntosh v. Partridge*, 540 F.3d 315, 321 (2008); *Velasquez v. Frapwell*, 165 F.3d 593, 594 (7th Cir. 1999).[6] Indeed, 28 U.S.C. § 1331 provides in

---

[5] Section 14 provides that "the state of Alabama shall never be made a defendant in any court of law or equity."

[6] These decisions (each of which involved defendants that indisputably were state employers) did not address the scenario, such as would be the situation in Alabama, of no available state court of competent jurisdiction to hear a USERRA claim against a state employer. Nor did they mention the express abrogation of state immunity set forth in § 4323(d)(3) of USERRA or the liberal canon of construction favoring

no uncertain terms that "[t]he district courts **shall** have original jurisdiction of **all** civil actions arising under the . . . **laws of the United States**." (Emphasis added.) Weaver has asserted 28 U.S.C. § 1331 as a jurisdictional basis for his USERRA claims. (*See* Complaint, ¶ 2.)

To construe § 4323(b)(2) as the exclusive jurisdictional provision available to state employees seeking to sue state employers would foreclose such lawsuits in Alabama, given that Alabama's state courts lack subject matter jurisdiction over USERRA claims against Alabama. Such a construction would interfere with the operation of USERRA and disserve the Act's purposes by weakening the Act as a deterrent to and remedy for violations of the Act by state employers.

By contrast, a permissive interpretation of "may" as used in § 4323(b)(2) comports not only with the plain meaning of the term but, also, the liberal canon of construction in favor of servicemembers, and fulfillment of USERRA's explicit abrogation of state sovereign immunity at § 4323(d)(3), which provides that states "shall be subject to the same remedies . . . as may be imposed upon any private employer under [§ 4323]." A permissive construction is warranted when, as is the case in Alabama, no state court of competent jurisdiction exists in which a state employee can sue under USERRA.

---

servicemembers and veterans that courts must apply in construing USERRA.

Moreover, given Congress's clear intent to subject state employers to private suits under USERRA and the full panoply of USERRA's remedies in such suits, and to effectuate the Act's purposes, implying a federal cause of action for such lawsuits is consistent with the Act. *See Cannon v. University of Chicago*, 441 U.S. 677 (1979) (implying cause of action under Title IX of Education Amendments of 1972). When there is no state court of competent jurisdiction in which to bring a USERRA claim against a state employer, the need to imply a federal cause of action is compelling.

## II. States Have No Immunity to Private Suits Authorized by Congress Under Its War Powers.

Because states have no entitlement to sovereign immunity from private suits to enforce USERRA, the Board would have no immunity from Weaver's claims even if it were an "arm of the state." USERRA was enacted pursuant to Congress's War Powers, which include authority to subject nonconsenting states to private suits to enforce the Act.

### A. Congress Enacted USERRA Pursuant to Its War Powers.

The Constitution authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution the [War] Powers" granted by Article I of the Constitution. U.S. Const. art. I, § 8, cl. 18. Congress's War Powers include the power to "provide for

the common Defence," U.S. Const. art. I, § 8, cl. 1; "declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water," U.S. Const. art. I, § 8, cl. 11; "raise and support Armies," U.S. Const. art. I, § 8, cl. 12; "provide and maintain a Navy," U.S. Const. art. I, § 8, cl. 13; "make Rules for the Government and Regulation of the land and naval Forces," U.S. Const. art. I, § 8, cl. 14; "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," U.S. Const. art. I, § 8, cl. 15; and "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress," U.S. Const. § 8, cl. 16.

Congress unquestionably exercised its War Powers in enacting USERRA. The Act's expressly stated purposes are military related—to "encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service"; "minimize the disruption to the lives of" servicemembers by providing for their prompt reemployment upon completion of service; and prohibit discrimination against servicemembers. 38 U.S.C. § 4301(a). Further, the substantive rights and protections of USERRA, although in the context of civilian employment, accrue to servicemembers by virtue of their military

service or status. The Act prohibits employment discrimination on the basis of a person's past, current, or future military membership or service, 38 U.S.C. § 4311(a); deems employees who are away for military duty to be on a leave of absence from work and entitles them to certain employment benefits while they are away, §§ 4316(b) and (d), 4317; entitles eligible returning servicemembers to reemployment, § 4312; specifies the jobs into which reemployed servicemembers must be placed, and requires employers to make reasonable efforts qualify them for such jobs and, if necessary, accommodate their service-related disabilities, 38 U.S.C. §§ 4313, 4314; requires that a reemployed servicemember's absence for military be deemed continuous employment for purposes of seniority and any benefits based on length of employment, §§ 4316(a), 4318; and provides protection from unjust discharge to employees returning from service of more than 30 days, § 4316(c).

Courts have readily concluded that USERRA is a War Powers enactment. *See, e.g., Bedrossian v. Northwestern Memorial Hosp.,* 409 F.3d 840, 843-44 (7th Cir. 2005) ("USERRA was enacted in 1994 pursuant to the War Powers Clause to encourage noncareer military service, to minimize disruptions in the lives and communities of those who serve in the uniformed services, and to prohibit discrimination against people because of their service.") (footnote omitted); *Risner v. Ohio Dept. of Rehabilitation and Correction,* 577 F.Supp.2d 953, 964-65 (N.D. Ohio 2008) (noting that USERRA "was enacted pursuant to

Congress' Article I War Powers"); *Palmatier v. Michigan Dep't of State Police,* 981 F.Supp. 529, 532 (W.D. Mich. 1997) (finding that USERRA "was enacted pursuant to the War Powers Clause, Art. I, § 8, cl. 11"); *Larkins*, 806 So.2d at 362 ("The remedy created by Congress to protect members of the Armed Forces in their employment is clearly grounded in Art. I, § 8, dealing with the power of Congress to provide for armies and the navy, and to make rules for the Government in regulation of the land and naval forces."). Our research has disclosed no court to have found otherwise.

> B.      Congress Can Subject States to Private Suits Pursuant to Its War Powers.

Congress's War Powers include authority to subject states to private lawsuits without their consent. Although Congress cannot override states' sovereign immunity in legislation enacted pursuant to its commerce powers under Article I of the Constitution, *see Alden v. Maine,* 527 U.S. 706 (1999) (Fair Labor Standards Act); *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44 (1996) (Indian Gaming Regulatory Act), Congress is not so constrained in the exercise of its War Powers.

In *Seminole Tribe*, the Court indicated that Congress had no power under Article I of the Constitution, not just the commerce powers, to override states' sovereign immunity from private suits. However, in *Central Virginia Community College v. Katz,* 546 U.S. 356 (2006), the Court disregarded as dicta the language in *Seminole Tribe* to such effect, and found that Congress's Article I power to enact

27

bankruptcy laws included authority to subject states to bankruptcy proceedings.

Rather than using a bright-line test to determine whether an Article I power authorizes Congress to subject nonconsenting states to private suits, the Court's post-*Seminole Tribe* decisions have primarily focused on the expectations at the time the Constitution was ratified. *See Katz*, 546 U.S. at 362-63 ("The history of the Bankruptcy Clause, the reasons it was inserted in the Constitution, and the legislation proposed and enacted under its auspices immediately following ratification of the Constitution demonstrate that it was intended . . . to authorize limited subordination of state sovereign immunity in the bankruptcy arena."); *Alden*, 527 U.S. at 713 ("[T]he States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments").

Application of such a historical approach provides compelling evidence that the Founders understood that the states would have no sovereign immunity in relation to congressional enactments pursuant to the War Powers. First, the states did not have war powers prior to the Constitution's adoption. *See United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 316 (1936) ("[S]ince the states severally never possessed international powers, such powers could not have been carved

from the mass of state powers but obviously were transmitted to the United States from some other source."). *But see Velasquez v. Frapwell,* 160 F.3d 389, 392-93 (7th Cir 1998) (noting that "what *Curtiss-Wright* says" may be incorrect), *vacated in part*, 165 F.3d 593 (7th Cir. 1999). Even if the states had war powers at some point after independence from Great Britain, the Articles of Confederation necessarily transferred any such powers from the states to the federal government. *See* Articles of Confederation,[7] art. 6 ("No State shall engage in any war without the consent of the United States" except when "actually invaded by enemies" or in imminent danger of invasion by Indians); *id.*, art. 9 (stating that "[t]he United States . . . shall have the sole and exclusive right and power of determining on peace and war"). Because states' sovereign powers prior to ratification of the Constitution did not include war powers, the states could not have reasonably thought they would have immunity from laws enacted pursuant to Congress's War Powers. *See* Jeffrey M. Hirsch, *Can Congress Use Its War Powers to Protect Military Employees from State Sovereign Immunity?,* 34 Seton Hall L. Rev. 999, 1025 (2004) ("Although states may have generally retained their sovereign immunity under the Constitution—even against express federal abrogation—it is implausible that they expected to have immunity where the federal government exercises powers that the states never possessed.").

---

[7] The Articles of Confederation are available at http://avalon.law.yale.edu/18th_century/artconf.asp (last visited Sept. 2, 2012).

Second, the Constitution grants the War Powers exclusively to the federal government. The Founders believed that an exclusive grant of power to the federal government in the Constitution automatically removed any right of sovereignty over a like power that states were entitled to before the Constitution's ratification. In The Federalist No. 32, Alexander Hamilton wrote:

> [A]s the plan of the convention aims only at a partial union or consolidation, the State governments would clearly retain all the rights of sovereignty which they before had, and which were not, by that act, EXCLUSIVELY delegated to the United States. This exclusive delegation, or rather this alienation, of State sovereignty, would only exist in three cases: where the Constitution in express terms granted an exclusive authority to the Union; where it granted in one instance an authority to the Union, and in another prohibited the States from exercising the like authority; and where it granted an authority to the Union, to which a similar authority in the States would be absolutely and totally CONTRADICTORY and REPUGNANT.

The Federalist No. 32 (Alexander Hamilton), *available at* http://thomas.loc.gov/home/histdox/fed_32.html (last visited Aug. 31, 2012) (emphasis in original). Such "alienation" of states' previous rights of sovereignty logically would preclude states from asserting sovereign immunity as a defense against private suits to enforce laws enacted pursuant to an exclusive federal power, such as the War Powers.

While the term "exclusive" does not appear in grants of War Power to Congress in Article I, Section 8, the exclusivity of Congress's

War Powers is evident in Article I, Section 10, Clause 3, which denies

war powers to the states. That provision states,

> No State shall, without the Consent of Congress . . .
> keep Troops, or Ships of War in time of Peace, enter
> into any Agreement or Compact with another State, or
> with a foreign Power, or engage in War, unless actually
> invaded, or in such imminent Danger as will not admit
> of delay.

U.S. Const. art. I, § 10, cl. 3. As noted in The Federalist No. 32, an

exclusive delegation to the federal government and alienation of state

sovereignty would exist "where [the Constitution] granted in one

instance an authority to the Union, and in another prohibited the

States from exercising the like authority." The granting of war powers

to Congress and the denial of the same to the states thus would have

effected an "alienation" of any potential claim of state sovereignty that a

state might seek to assert against Congress's War Powers.

For the states to have war powers certainly "would be

absolutely and totally CONTRADICTORY and REPUGNANT." The

Federalist No. 32 (emphasis in original). The exercise of war powers by

states in their own right inevitably would wreak havoc with foreign

relations, prevent a "common defense" against invasion, and unravel

the fabric of our nation. *See In re Tarble,* 80 U.S. 397, 408 (1871) ("No

interference with the execution of th[e] power of the National

government in the formation, organization, and government of its

armies by any State officials could be permitted without greatly

impairing the efficiency, if it did not utterly destroy, this branch of the

31

public service.); Hirsch, 34 Seton Hall L. Rev. at 1023-24 (noting that "it is difficult to imagine any federal authority to which a similar authority granted to individual states would be more 'contradictory and repugnant'").

Third, as is evident in the exclusivity of Congress's War Powers provided in the text of the Constitution, the Founders intended that there be no limitation on Congress's War Powers. Hamilton wrote the following on this topic:

> The authorities essential to the common defense are these: to raise armies; to build and equip fleets; to prescribe rules for the government of both; to direct their operations; to provide for their support. These powers ought to exist without limitation, BECAUSE IT IS IMPOSSIBLE TO FORESEE OR DEFINE THE EXTENT AND VARIETY OF NATIONAL EXIGENCIES, OR THE CORRESPONDENT EXTENT AND VARIETY OF THE MEANS WHICH MAY BE NECESSARY TO SATISFY THEM. The circumstances that endanger the safety of nations are infinite, and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed. . . .

> . . . .[T]here can be no limitation of that authority which is to provide for the defense and protection of the community, in any matter essential to its efficacy that is, in any matter essential to the FORMATION, DIRECTION, or SUPPORT of the NATIONAL FORCES.

The Federalist No. 23 (Alexander Hamilton) (emphasis in original), *available at* http://thomas.loc.gov/home/histdox/fed_23.html (last visited

Sept. 3, 2012). In light of such emphasis on unlimited, exclusive congressional authority under the War Powers, the Founders surely would have viewed granting states sovereign immunity from suits brought under War Powers enactments to be unconstitutional.

Last, but not least, the Supreme Court has recognized the predominance of Congress's War Powers. *See, e.g., Lichter v. U.S.,* 334 U.S. 742, 781 (1948) ("'[Congress's war] power explicitly conferred and absolutely essential to the safety of the Nation is **not destroyed or impaired by any later provision of the constitution or by any one of the amendments**.'") (quoting with approval Address by Hon. Charles E. Hughes) (emphasis added); *In re Tarble,* 80 U.S. 397, 408 (1871) (observing that Congress's war powers are "plenary and exclusive"). *Lichter*'s pronouncement that amendments to the Constitution do not impair or destroy Congress's War Powers is particularly significant in showing that the Court considers the Eleventh Amendment inapplicable to laws enacted pursuant to Congress's War Powers.

Given that the states had no sovereign war powers at the time of the Constitutional Convention, that the Constitution granted war powers exclusively to Congress and expressly denied the states such powers, that the Founders believed such exclusive congressional powers eclipsed previously existing rights of state sovereignty, and the Founders' intent that no "constitutional shackles" be applied to Congress's authority under the War Powers, it is evident that the states

33

have no immunity from Congress's war powers in the plan of the convention. Therefore, states cannot validly claim sovereign immunity from private suits to enforce laws enacted pursuant to Congress's War Powers, including USERRA. The principle asserted by the Supreme Court in *Lichter* that amendments to the Constitution neither impair or destroy the War Powers is consistent with this conclusion.

C.   Congress Validly Exercised Its War Powers in Authorizing Private Suits Against States Under USERRA.

USERRA's authorization for private suits against states is a valid exercise of Congress's War Powers. As discussed above, USERRA was enacted pursuant to the War Powers, and those powers confer on Congress authority to subject nonconsenting states to private lawsuits.

Furthermore, rather than being simply an employment law, USERRA enforces the War Powers. The Act's provisions (summarized above) are designed to raise and support armies of noncareer servicemembers by removing disadvantages to civilian careers and employment that can result from military service; minimizing disruption to the lives of servicemembers by providing for prompt reemployment after military service; and prohibiting service-related employment discrimination. *See* 38 U.S.C. § 4301(a). Thus, as the Supreme Court recognized, such legislation "provides the mechanism for manning the Armed Forces of the United States." *Alabama Power*

*Co. v. Davis,* 431 U.S. 581, 583 (1977) (Military Selective Service Act).[8]
*See Peel v. Florida Dep't of Transportation,* 600 F.2d 1070, 1084 (5th
Cir. 1979)[9] ("Providing reemployment rights for those who have been
called to the service of their country is, in our view, a legitimate
exercise of Congress's power to raise armies.") (Veterans'
Reemployment Rights Act)[10]; Timothy M. Harner, *The Soldier and the
State: Whether the Abrogation of State Sovereign Immunity in USERRA
Enforcement Actions Is a Valid Exercise of the Congressional War*

---

[8] Although *Alabama Power* was decided under USERRA's predecessor
legislation, it remains good law to the extent consistent with USERRA.
*See* 20 C.F.R. § 1002.2 (noting that Congress intended "the large body of
case law that had developed under [prior veterans' employment and
reemployment rights] statutes [to] remain[] in full force and effect, to
the extent it is consistent with USERRA"); *Francis v. Booz, Allen &
Hamilton, Inc.,* 452 F.3d 299, 303 (4th Cir. 2006) ("we can and should
use relevant pre-USERRA case law as a guide toward understanding
USERRA."). USERRA is the latest version of federal legislation
providing civilian employment rights and benefits to servicemembers.
See H.R. Rep. No. 103-65, pt. 1, at 19 (1993), *as reprinted in* 1994
U.S.C.C.A.N. 2449, 2452; S. Rep. No. 103-158, at 40 (1993), *available at*
1993 WL 432576, *40 (Leg.Hist.). *Alabama Power* was decided under
the Military Selective Service Act, which like USERRA, provided
reemployment rights to veterans.

[9] The Eleventh Circuit adopted as binding precedent all former Fifth
Circuit cases decided prior to October 1, 1981. *Bonner v. City of
Prichard*, 661 F.2d 1206 (11th Cir.1981).

[10] "Veterans' Reemployment Rights Act" or "VRRA" was the name
commonly used for the employment and reemployment rights provisions
of the Vietnam Era Veterans' Reemployment Rights Act of 1974. *See* 20
C.F.R. § 1002.2. The VRRA was the immediate predecessor of
USERRA. H.R. Rep. No. 103-65, pt. 1, at 19 (1993).

*Powers,* 195 Mil. L. Rev. 91, 119 (2008) ("The USERRA . . . is a valuable [military] recruiting and retention tool, and as such is a valid exercise of congressional authority. Whether or not an employer is a private company or a state government simply makes no difference when it comes to these concerns.").

Prior to *Seminole Tribe*, the courts found that Congress's War Powers provided Congress with authority to subject nonconsenting states to private suits brought under USERRA's predecessor legislation. *See, e.g., Peel*, 600 F.2d at 1081, 1084; *Reopell v. Commonwealth of Mass.,* 936 F.2d 12 (1st Cir. 1991) (VRRA); *Jennings v. Illinois Office of Ed.,* 589 F.2d 935, 938 (7th Cir. 1979) (VRRA); *Moore v. State of Kansas,* 1979 WL 1866 (D. Kan. 1979) (VRRA); *Sheely v. Idaho Falls School Dist. No. 91,* 1978 WL 1667 (D. Idaho 1978) (VRRA); *Camacho v. Public Svc. Com. of Commonwealth of Puerto Rico,* 450 F.Supp. 231 (D.P.R. 1978) (VRRA).

After *Seminole Tribe,* the federal appeals courts have split on the question whether the War Powers confer congressional authority to subject unwilling states to private suits to enforce such laws. The First Circuit in *Diaz-Gandia v. Dapena-Thompson,* 90 F.3d 609 (1st Cir. 1996), declined to retreat from its earlier decision in *Reopell, supra,* finding that in acting pursuant to its War Powers, Congress removed any Eleventh Amendment bar to a suit for damages against a state under the VRRA. 90 F.3d at 616. *Seminole Tribe*'s "hold[ing] that Congress lacks the power to abrogate the Eleventh Amendment under

36

the Commerce Clause . . . does not control the War Powers analysis,"
the First Circuit sa*id. Id.* Taking the opposite view, the Seventh Circuit
held that the Eleventh Amendment barred a private USERRA suit
against a state employer because in light of *Seminole Tribe,* "no
legislation enacted under any provision of Article I can abrogate the
sovereign immunity of the states." *Velasquez,* 160 F.3d at 395. The
Seventh Circuit's rationale is erroneous because it rests solely on the
notion, which *Alden* later rejected, that Congress has no authority
under Article I to make nonconsenting states amenable to private
lawsuits.

Although the Eleventh Circuit in *United States v. Alabama
Dep't of Mental Health and Mental Retardation,* 673 F.3d 1320 (11th
Cir. 2012), said sovereign immunity would have barred a veteran from
suing a state defendant under USERRA, the court's comment was dicta.
*See* 673 F.3d at 1325. The issue of whether states enjoy sovereign
immunity from private suits under USERRA was not before the court.
The United States, not the veteran, was the plaintiff in the case.
Accordingly, this Court is not constrained by the Eleventh Circuit's
comment.

Because USERRA is a valid exercise of Congress's War Powers,
and because the War Powers include authority to make states amenable
to private suits, it is clear that even if the Board were an arm of the
state, it would have no sovereign immunity from Weaver's claims.

### III.    Even if the Eleventh Amendment Applied to USERRA Cases, the Board Would Not Be Immune from Liability.

As explained above, sovereign immunity is not a viable defense to private USERRA claims against states. However, even if such immunity were available, the Board still would not be immune because it is not an "arm of the state.

The key question for the Court in analyzing whether the Board qualifies as an "arm of the state" for purposes of sovereign immunity is whether the particular **function** performed by the Defendants and at issue in this action is entitled to Eleventh Amendment immunity. Instead of focusing narrowly, the Defendants have launched a broad-based attack which, if accepted by this Court, will immunize **all** Alabama school boards against private enforcement of **any** federal law adopted under Article I of the Constitution. The Defendants seek to expand the powers of all school boards in Alabama by allowing them to ignore USERRA and say, in effect, to Guard members and Reservists they have no rights which a school board is bound to respect.

### A.    The Madison City Board of Education Has the Burden of Establishing Its Status as an Arm of the State.

Although neither the Supreme Court nor the Eleventh Circuit ruled on the issue, every other federal appellate court that has considered the question has held the burden of establishing Eleventh

Amendment immunity lies with the proponent of the immunity.[11] As the Ninth Circuit found nearly two decades ago,

> Eleventh Amendment immunity . . . does not implicate a federal court's subject matter jurisdiction in any ordinary sense. It therefore cannot be said that the general principle that the plaintiff must establish the facts supporting "jurisdiction" means that ITSI should have been required to prove that [the defendants] were not entitled to such immunity. Rather, we believe that Eleventh Amendment immunity, whatever its jurisdictional attributes, should be treated as an affirmative defense.

*ITSI TV Prods., Inc. v. Agric. Ass'ns.,* 3 F.3d 1289, 1291 (9th Cir.1993).

Although the Eleventh Circuit has held "the plaintiff bears the burden of proving the court's jurisdiction,"[12] none of the cases in which the court so ruled related to Eleventh Amendment immunity. In *Majd-Pour,* the jurisdictional question was diversity of citizenship, but the same rule has also been applied where the jurisdictional issue was the amount in controversy[13] or the Tax Injunction Act.[14]

---

[11]  *See Wojcik v. Massachusetts State Lottery Com'n,* 300 F.3d 92, 99 (1st Cir. 2002); *Woods v. Rondout Valley Central School Dist. Bd of Educ.,* 466 F.3d 232, 237 (2nd Cir. 2006); *Christy v. Pa. Turnpike Comm'n,* 54 F.3d 1140, 1144 (3d Cir.1995); *Skelton v. Camp,* 234 F.3d 292, 297 (5th Cir.2000); *Gragg v. Ky. Cabinet for Workforce Dev.,* 289 F.3d 958, 963 (6th Cir.2002); *Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728, 734 n. 5 (7th Cir.1994); *ITSI TV Prods., Inc. v. Agric. Ass'ns.,* 3 F.3d 1289 (9th Cir.1993).

[12]  *Majd-Pour v. Georgiana Community Hosp., Inc.,* 724 F.2d 901, 903 (11th Cir. 1984).

[13]  *Morrison v. Allstate Indem. Co.,* 228 F.3d 1255 (11th Cir. 2000).

B.    The "Twin Reasons" for Eleventh Amendment Immunity.

In *Hess v. Port Authority Trans-Hudson Corp.,* 513 U.S. 30, 41, 47 (1994),  the Supreme Court cited "the Eleventh Amendment's twin reasons for being" as avoiding "an affront to the dignity" of the State and "the prevention of federal-court judgments that must be paid out of a State's treasury."

The Court noted that subjecting sub-state and bi-state entities to suit in federal courts is not an affront to a state's dignity:

> [U]ltimate control of every state-created entity resides with the State, for the State may destroy or reshape any unit it creates. "[P]olitical subdivisions exist solely at the whim and behest of their State," [*Port Authority Trans–Hudson Corporation v.*] *Feeney*, 495 U.S. [299,] at 313, 110 S.Ct. [1868,] at 1877[, 109 L.Ed.2d 264 (1990)] (Brennan, J., concurring in part and concurring in judgment), yet cities and counties do not enjoy Eleventh Amendment immunity.

*Hess,* 513 U.S. at 47. In *Federal Maritime Com'n v. South Carolina State Ports Authority,* 535 U.S. 743, 760 (2002), the Court held, "The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities."

The *Hess* Court explained the second of the twin reasons:

> The proper focus is not on the use of profits or surplus, but rather is on losses and debts. If the expenditures of the enterprise exceed receipts, is the State in fact

---

[14] *Colonial Pipeline Co. v. Collins,* 921 F.2d 1237 (11th Cir. 1991).

> obligated to bear and pay the resulting indebtedness of
> the enterprise? When the answer is "No"—both legally
> and practically—then the Eleventh Amendment's core
> concern is not implicated.

*Hess,* 513 U.S. at 51.

If this Court uses the *Hess* test, the Eleventh Amendment immunity of the Madison City Board of Education comes down to the "losses and debts" issue, which as we show below, means that the Board is not entitled to immunity. If this Court uses a combination of the *Hess* and *Federal Maritime* tests, there is no way the Board can show that it is an arm of the State.

C.    The *Manders* Test.

The Eleventh Circuit uses a four-part test "to determine whether an entity is an 'arm of the State' in carrying out a particular function: (1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Manders v. Lee,* 338 F.3d 1304, 1309 (11th Cir 2003) (en banc).

In 1990, this four-part test (then articulated with the third and fourth parts combined) was used by the Eleventh Circuit in *Stewart v. Baldwin Co. Bd. of Educ.,* 908 F.2d 1499, 1509-1511 (11th Cir. 1990):

> The Supreme Court in *Mt. Healthy,*[15] looking to Ohio
> state law, found that the school board was not entitled
> to Eleventh Amendment immunity:

---

[15] *Mt. Healthy Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977).

> Under Ohio law the "State" does not include
> "political subdivisions," and "political subdivisions"
> do include local school districts. Petitioner is but one
> of many local school boards within the State of Ohio.
> It is subject to some guidance from the State Board
> of Education and receives a significant amount of
> money from the State. But local school boards have
> extensive powers to issue bonds and to levy taxes
> within certain restrictions of state law. On balance,
> the record before us indicates that a local school
> board of education is more like a county or city than
> it is like an arm of the state.

*Mt. Healthy,* 429 U.S. at 280-81, 97 S.Ct. at 572-73. [FN6]  Using a similar analysis, this court has previously rejected claims by local boards of education in Florida, Mississippi, and Louisiana that they are entitled to Eleventh Amendment protection. *See Travelers Indemnity Co. v. School Bd. of Dade County,* 666 F.2d 505 (11th Cir.1982) (Florida); *Moore v. Tangipahoa Parish School Bd.,* 594 F.2d 489, 493-94 (5th Cir.1979) (Louisiana); *Campbell v. Gadsden County Dist. School Bd.,* 534 F.2d 650, 655-56 (5th Cir.1976) (Florida); *Adams v. Rankin County Bd. of Educ.,* 524 F.2d 928, 929 (5th Cir.1975) (per curiam) (Mississippi). These cases noted that state law gave the school boards at issue a substantial amount of control over their own affairs, e.g., the boards possessed power to contract, to sue and be sued, to purchase and sell property, to borrow funds, and to levy and collect taxes. *See Moore,* 594 F.2d at 493-94; *Travelers Indemnity Co.,* 666 F.2d at 507- 08. These cases also placed considerable significance on the fact that the individual school boards had the means to raise funds, so that any judgment for the plaintiff could be paid out of local funding rather than out of the state treasury. *See Adams,* 524 F.2d at 929 & n. 4; *Travelers Indemnity Co.,* 666 F.2d at 509. We conclude that the Baldwin

County Board of Education, like the school boards of
Florida, Louisiana, and Mississippi discussed above, is
not an arm or an alter ego of the state.

> FN6. That Alabama state courts provide county
> boards of education with sovereign immunity in
> state tort law actions does not require a similar
> treatment under the Eleventh Amendment. The
> Supreme Court's resolution in *Mt. Healthy* is
> instructive. At the time that *Mt. Healthy* was
> decided, the case law in Ohio was clear that a local
> school board was cloaked in sovereign immunity to
> the same degree as the state itself from suits arising
> in tort. [citations omitted] Consequently, defendant's
> attempt to conflate sovereign immunity with regard
> to a state-created tort with Eleventh Amendment
> immunity for a federal cause of action is unavailing.
> [citation omitted] For similar reasons, defendant's
> claim that the Alabama constitution shields it with
> Eleventh Amendment immunity is in error.

County school boards in Alabama possess a significant
amount of flexibility in raising local funding. The
board's authority to manage its own finances includes
the ability to raise revenues by selling interest-bearing
tax anticipation warrants, Ala. Code § 16-13-70, et seq.
(1988);[16] the statutory authorization to expend money
raised by taxes in support of public schools in the
district or county in which it was raised, *id.* at § 16-13-
32;[17] the authorization to spend revenues from county

---

[16] Except as noted below, the Code sections cited in the *Stewart* opinion
have not been amended or repealed. Ala. Code § 16-13-76 has been
amended to change some references to the minimum program fund to
the Foundation Program Fund. All of Chapter 13 in Title 16 applies to
both city and county boards.

[17] This section has been replaced by a section governing gifts or grants
to the board.

43

sales and use-tax funds for educational purposes, *id.* at § 16-13-37;[18] § 16-13-145;[19] and the authorization to borrow funds, *id.* at § 16-13-145; § 16-13-211. In addition, the school boards are required to hold "a meeting for the purpose of giving the public an opportunity of presenting to the board matters relating to the allotment of public school funds."   *Id.* at § 16-8-3.[20] It is clear that Alabama school boards have a degree of fiscal autonomy comparable to that of the school boards at issue in *Mt. Healthy* (received significant amount of money from the state, but had extensive powers to issue bonds and to levy taxes within certain restrictions of state law), *Moore* (had power to sue and be sued, to purchase and sell property, to borrow money, to levy taxes), and *Adams* (had local funding primarily through an ad valorem tax, which was supplemented by the state if insufficient, and had flexible tax structure allowing the board to tap local resources when increased resources were necessary). Consequently, even though the school boards are required to submit their budgets to the state superintendent for approval, *id.* at § 16-13-140,[21]

---

[18] Terminology in this section has been changed without changing the substance.

[19] Terminology in this section has been changed without changing the substance.

[20] All local boards are now required to put monthly financial statistics and annual budgets on their websites. Ala. Code § 16-13A-6 (2011 Cumm. Supp.). In addition, each local board "shall hold at least two open public hearings pertaining to its proposed annual budget." Ala. Code § 16-13-140(c) (amended in 1997).

[21] Terminology in this section has been changed without changing the substance. The Defendants assert, "City and county boards of education budgets are ultimately submitted to the state legislature for approval." Doc. 19 at CM/ECF p. 88. However, both § 16-13-140 and § 16-13-143 require submission to the State Superintendent.

it cannot be said that a judgment against a county school board will come from state funds.

Moreover, the county school boards in Alabama have the power to establish general education policy for the schools, *id.* at § § 16-8-10,[22] 16-8-28;[23] they possess general administration and supervision responsibility for the schools, *id.* at § § 16-8-8, 16-8-9;[24] and they are imbued with the authority to assign teachers and to place students, *Opinion of the Justices,* 276 Ala. 239, 160 So.2d 648, 650-51 (1964). Additionally, the boards are subject to a significant amount of local control. Board members are elected by "the qualified electors of the county", Ala. Code at § 16-8-1,[25] and they receive compensation from the public funds of the county, *id.* at § 16-8-5.[26]

\*\*\*

We conclude, therefore, that the Baldwin County Board of Education is not an "arm of the State" for purposes of Eleventh Amendment immunity, and we affirm the district court's denial of summary judgment on the basis of such immunity.

A case arising from a federal claim brought in state court was also decided using the *Manders* test. The complaint included a claim

---

[22] This section has been repealed and its subject matter transferred to § 16-1-30.

[23] The corresponding provision for city boards is § 16-11-20.

[24] The corresponding provision for city boards is § 16-11-9.

[25] City boards are elected by the city governing body, Ala. Code § 16-11-3. The Madison City Board of Education is elected by the Madison City Council.

[26] The corresponding provision for city boards is § 16-11-2(d).

against a school board and its personnel director for "allowing an
employee, the defendant Reaves, to continue teaching and/or coaching
with multiple complaints on his record for sexual harassment while
taking no action to punish this pedophile or to stop this pedophile's
sexual misconduct. As a proximate result of the said violation, the
plaintiff A.S. was sexually molested and raped." *Ex parte Madison
County Bd. of Education,* 1 So.3d 980, 986 (Ala. 2008). After the circuit
court denied the board's motion to dismiss (based on sovereign
immunity under the Eleventh Amendment), the board sought a writ of
mandamus from the Alabama Supreme Court. That court ruled as
follows:

> In the case before us, the Board's function that is at
> issue here involves the Board's ability to transfer
> and/or terminate a teacher's employment. It is with
> regard to this particular function that we will evaluate
> whether the Board is entitled to Eleventh Amendment
> immunity.
>
> 1. How State law defines a county board of education.
>
> The Alabama Legislature has specifically defined and
> designated the responsibilities of a county board of
> education. In § 16-8-1,[27] Ala. Code 1975, the
> legislature provided that a county board of education
> "shall be composed of five members, who shall be
> elected by the qualified electors of the county." Section
> 16-1-30(b), Ala. Code 1975, provides that a county
> board of education shall determine its own written

---

[27] All Code sections cited in the *Ex parte Madison County* case are still
in effect, unless noted otherwise.

educational policy for the board and its employees and
"shall prescribe rules and regulations for the conduct
and management of the schools." A county board of
education is vested with the "general administration
and supervision" of the schools in its county. § 16-8-8,
Ala. Code 1975. Specifically, a county board of
education "may suspend or dismiss for immorality,
misconduct in the office, ... or whenever, in the opinion
of the board, the bests interests of the school require it,
superintendents, principals, teachers, or any other
employees ...." § 16-8-23, Ala. Code 1975.[28] Likewise, a
county board of education can transfer any teacher to a
different position, school, or grade if the board
determines a transfer is needed. § 16-24-5,[29] Ala. Code
1975. The legislature also specifically provided that a
teacher subject to transfer or termination has the right
to contest the board's decision by a hearing before the
board. § 16-24-6, Ala. Code 1975. Thus, the Board
maintains significant authority with regard to the
employment and conduct of its teachers; this factor
lends little weight to the Board's being considered an
"arm of the State" and thereby entitled to Eleventh
Amendment immunity.

2. The degree of control the State maintains over the
county board of education.

The Board argues that because the State
superintendent of education has final, binding
"authority to review actions and orders of county and

---

[28] The corresponding provision for city boards is § 16-11-17.

[29] The Students First Act, §§ 16-24C-1 et seq. (effective 1 July 2011)
repealed and replaced both the Teacher Tenure Act, §§ 16-24-1 et seq.
and the Fair Dismissal Act, §§ 36-26-100 et seq. The Fair Dismissal Act
provided similar due process protections for non-teacher employees of
educational institutions as the Teacher Tenure Act provided for
teachers in K-12 schools.

city boards of education ... in matters relating to finance and other matters seriously affecting the educational interest," *see* § 16-4-8, Ala. Code 1975, a county board of education is governed by and limited by the boundaries set by the State. The Board provides an extensive list of limitations placed on the authority of county boards of education. This Court, however, has specifically recognized:

> "However broad may be the powers of the State Board of Education, ... we think it clear that the authority to exercise general control and supervision over the county ... boards of education does not include the authority to exercise the powers and authority which the Legislature has specifically conferred upon such local boards.
>
> "....
>
> "In regard to the authority to transfer or reassign teachers from one public school to another public school within a ... county school system, it is conferred upon local boards of education ...."

*In re Opinion of the Justices No. 180,* 276 Ala. 239, 241, 160 So.2d 648, 650 (1964).

Thus, because the legislature has specifically vested in county boards of education the authority to transfer, suspend, or dismiss teachers, this second factor does not weigh in favor of the Board's being considered an "arm of the State" and thereby entitled to Eleventh Amendment immunity.

3. Where the county board of education derives its funds.

The Board argues that because this Court has held that all public-school funds are State funds, whether collected at the State or the local level, we must

48

conclude that this factor weighs heavily in favor of the Board's being considered an "arm of the State." *See Mobile, Alabama-Pensacola, Florida Bldg. & Constr. Trades Council v. Williams,* 331 So.2d 647, 648 (Ala.1976) (holding that regardless of whether the public-school funds come from the State treasury or from local taxation, public-school funds are State funds); and *State v. Tuscaloosa County,* 233 Ala. 611, 613, 172 So. 892, 894 (1937) ("[P]ublic school funds, as between the county and State, are State funds."). The fact that this Court has declared all public-school funds to be State funds does not address the question from where the Board *derives* its funds. Nothing properly before us indicates the source of the Board's funds; FN6 therefore, without any documentation to support this factor, we cannot conclude that it weighs in favor on the Board.

> FN6. The Board in its brief on application for rehearing provided information from the Alabama Education Department, Annual Report 2004, indicating that in 2004 the Board received 54.24% of its funding from the State. This information, however, is contained in the argument of counsel and is not supported by any documentation.

4. Who is responsible for judgments against the entity.

The Board boldly asserts that, "[i]f all school funds are *State* funds, then any judgment against the Madison County Board of Education must be satisfied entirely from State funds allocated and intended for the education of students in Madison County." As with the third factor, such a general conclusion without any evidentiary support does not support the conclusion that any judgment against the Board would be payable out of the State treasury.

Thus, application of the *Manders* test to the facts
before us does not support a finding that the Board has
established a right to Eleventh Amendment immunity.

*Ex parte Madison County Bd. of Education.*[30]

The most recent application of *Manders* is in *Versiglio v. Board
of Dental Examiners of Alabama,* 651 F.3d 1272 (2011), *vacated and
superseded on reh'g,* 686 F.3d 1290 (11th Cir. 2012).  Despite the 2012
decision vacating the 2011 opinion, the two must be read together to
make sense of the court's decision. In the 2011 opinion, the court
recounted the four-part *Manders* test.[31] The court decided three of the
four factors in favor of immunity, but held that the Board was not
immune because the Alabama Court of Civil Appeals had recently found
it was not a state agency and not immune under Section 14 of the
Alabama Constitution. *Versiglio,* 651 F.3d at 1276-77.

After the Alabama Supreme Court reversed and held the Board
was a state agency protected by Section 14, the Eleventh Circuit
vacated its 2011 decision and substituted a short opinion based entirely
on the holding of the Alabama Supreme Court. *Versiglio,* 686 F.3d 1290.
If one read only the 2012 opinion, it might appear that the State's

---

[30] 1 So.3d 980, 987-89 (Ala. 2008) (emphasis in original).

[31] *Versiglio,* 651 F.3d at 1273-74.  The Court cited *Miccosukee Tribe of
Indians v. Florida State Athletic Commission,* 226 F.3d 1226 (11th
Cir.2000).

definition is the sole deciding factor. Properly read, the *Versiglio* 2012 opinion is not overruling the *Manders* test.[32]

>       D.      Does State Law Define a City Board of Education as an
>               Arm of the State?

The label the State places on a unit of government does not determine how it will be treated under federal law.

> This is not to say that state law can answer the
> question for us by, for example, simply labeling as a
> state official an official who clearly makes county
> policy. But our understanding of the **actual function**
> of a governmental official, in a particular area, will
> necessarily be dependent on the definition of the
> official's functions under relevant state law.

*McMillian v. Monroe County, Ala.,* 520 U.S. 781, 786 (1997) (emphasis added).[33]

As noted above, a city board of education is intertwined with the government of the city it serves. The board also has powers that it may exercise on its own.

---

[32] Plaintiff understands that this Court must follow *Manders* and *Versiglio,* but the Court should be mindful that *Versiglio* may have created a split in the circuits. Compare the primacy of the state-law status of the entity in the *Versiglio* decisions with the other circuits' decisions cited in the dissent of Judge Anderson in *Manders*, 338 F.3d at 1331 n.3, and their holdings that the financial stake of the state treasury is the most important factor.

[33] *See also, e.g., Johnson v. Ogeechee Behavioral Health Services,* 479 F.Supp.2d 1357 (S.D. Ga. 2007) (defendant had state-law immunity, not Eleventh Amendment immunity).

Applying the function-by-function approach of *Manders,* the question is whether a city board of education engaged in making a personnel decision is an arm of the State. The Eleventh Circuit has held that a Florida sheriff dismissing employees was not entitled to Eleventh Amendment immunity.[34]

Alabama has its own form of immunity written into the State Constitution, Art. I, § 14: "[T]he State of Alabama shall never be made a defendant in any court of law or equity." The Alabama Supreme Court has defined "the State" to include agencies of the State as well as some employees of the State.[35] Interpreting § 14, the Alabama Supreme Court has held, "Local school boards are agencies of the State, not of the local governmental units they serve, and they are entitled to the same absolute immunity as other agencies of the State."[36]

But the Court has also held that a "Board [of Education] and its members do not have immunity under § 14 against the federal-law

---

[34] *Gordan v. Cochran,* 116 F.3d 1438, 1439 & n.1 (11th Cir. 1997), cited with approval in *Abusaid v. Hillsborough County Bd. of County Com'rs,* 405 F.3d 1298, 1304 (11th Cir. 2005).

[35] "This Court has held that the immunity afforded the State by § 14 applies to instrumentalities of the State and State officers sued in their official capacities when such an action is effectively an action against the State." *Vandenberg v. Aramark Educ. Servs., Inc.,* 81 So.3d 326, 332 (Ala.2011).

[36] *Ex parte Bessemer Bd. of Educ.,* 68 So.3d 782, 789 (Ala. 2011), citing *Ex parte Hale County Bd. of Educ.,* 14 So.3d 844, 848–49 (Ala.2009).

claims filed against them."[37] The Defendants do not cite *Colbert County,* nor explain how a Board of Education's lack of immunity to a federal claim affects their argument.

> E.   Does Alabama Law Define Public Officials, Such as Supt. Fowler and the Board Members, as Arms of the State?

The Alabama courts make separate determinations whether the board on the one hand and the superintendent on the other are "the State." "[B]ecause the Board is entitled to sovereign immunity, there are only a limited number of bases on which its officials may be sued in their official capacities."[38]

The general rule as to employees is stated in *Shoals Community College v. Colagross,* 674 So.2d 1311, 1314 (Ala.Civ.App. 1995):

> Employees of state agencies, in their official capacities and individually, are also entitled to absolute immunity from suit when the action is, in effect, one against the state.  An action is one against the state when a favorable result for the plaintiff … would result in the plaintiff's recovery of money from the state.

But officials can be sued under the exceptions[39] found in *Aland v.*

---

[37] *Colbert County Bd. of Educ. v. James,* 83 So.3d 473 (Ala. 2011), citing *Abusaid v. Hillsborough County Bd. of County Comm'rs,* 405 F.3d 1298, 1315 (11th Cir.2005). There is no identification of the particular "federal-law claims" at issue in the *Colbert County* opinion.

[38] *Dees v. Coaker,* 51 So.3d 323, 333 (Ala.Civ.App. 2009).

[39] Some justices on the Alabama Supreme Court always enclose the word in quotation marks. "These actions are sometimes referred to as

*Graham,* 287 Ala. 226, 229-30, 250 So.2d 677 (1971) (emphasis added):

> (1) actions brought to **compel** State officials to perform their legal duties[40];
>
> (2) actions brought to **enjoin** State officials from enforcing an unconstitutional law[41];
>
> (3) actions to **compel** State officials to perform ministerial acts; and
>
> (4) actions brought under the **Declaratory Judgments** Act ... seeking construction of a statute and its application in a given situation.[42]

---

'exceptions' to § 14; however, in actuality these actions are simply not considered to be actions 'against the State' for § 14 purposes." *Alabama Dept. of Transp. v. Harbert Intern., Inc.,* 990 So.2d 831, 840 (Ala. 2008). Since one of the dictionary's definitions of "exception" is "a case to which a rule does not apply," it is reasonable to call an action to which § 14 does not apply an exception – without the quotation marks. Merriam-Webster Online, http://www.merriam-webster.com/dictionary/exception.

[40] *Ex parte Bessemer Bd. of Educ.,* 68 So.3d 782 (Ala. 2011) ("However, regarding the Bessemer Board members in their official capacities, Minor is entitled to bring an action to compel them to perform their legal duty or to perform a ministerial act. In the present case, it is undisputed that the Bessemer Board members have a statutory duty to pay Minor the appropriate salary increase under § 16–22–13.1, Ala.Code 1975. ").

[41] *See, e.g., Evatt v. Thomas,* --- So.3d ----, 2012 WL 2362634, *5 (Ala.Civ.App. 2012) ("Evatt sought a judgment declaring the unconstitutionality of two prison regulations and to enjoin Thomas from enforcing those regulations. Because such claims are exempt from § 14, Thomas is not entitled to § 14 immunity in this case.").

[42] *See, e.g., Dees v. Coaker,* 51 So.3d 323, 333 (Ala.Civ.App. 2009) (educational support personnel could sue for declaratory judgment that

Two additional types of exceptions to § 14 are listed in *Drummond Co. v. Alabama Dep't of Transp.,* 937 So.2d 56, 58 (Ala.2006) (emphasis added):

> (5) valid **inverse condemnation** actions brought against State officials in their representative capacity; and
>
> (6) actions for **injunction or damages** brought against State officials in their representative capacity and individually where it was alleged that they had **acted fraudulently, in bad faith, beyond their authority or in a mistaken interpretation of law.**

To summarize, the superintendent fails the first part of the *Manders* test because Alabama law does not consider him to be "the State" if he is accused of any of the six exceptions listed above. In addition, as noted in the Part immediately above, if Superintendent Fowler was making a personnel decision **not required** by State law, he is not an "arm of the State."

---

local board of education violated state law when it failed to implement a step-based salary structure).

F.     What "Functions" Are the Defendants Performing
       Relative to the Issues in This Case?

Weaver is employed by the Madison City Board of Education,
not by the State.[43] He continues to be employed by the Madison City
Board of Education.[44]

The Alabama Code says nothing about the salary of the CSFO,
the employees that he shall supervise, whether he can have other duties
in addition to those of the CSFO, his office space, his office furnishings,
and his general working conditions.[45]

MCS purports to grant military leave to its employees under
the terms of USERRA. *See* Exhibit 3.[46]

Superintendent Fowler is in general charge of the
administrative structure of the School System. Board policy 2.6.2 states:

2.6.2 Scope of Executive and Administrative Authority
– In addition to specific grants of authority set forth in

---

[43] See Weaver's contract with the Madison City Board of Education for
his position as Executive Director of Finance and Business, Exhibit 1,
Weaver Declaration, Exhibit C.

[44] See Weaver's W-2 forms 2007, 2009-10, Exhibit 1, Weaver
Declaration, Exhibit A.

[45] Ala. Code §§ 16-13A-4 and -5 (2011 Cumm. Supp.).

[46] This policy manual was effective in 2002 and still effective in 2007.
The current policy says, "Military leave is available to all eligible
employees in accordance with state and federal law." See Madison City
Schools Policy Manual at 59, Exhibit I to the Weaver Declaration
(hereafter cited as "Policy Manual"). Ala. Code §§ 31-12-1 *et seq.* (2011
Cumm. Supp.) provides for treatment of Reservists while they are on
active duty, but says nothing about their position, pay, or status upon
return – and thus is not applicable to this case.

particular Board policies, the Superintendent is
authorized to develop and implement such lawful and
reasonable rules, regulations, operating procedures,
administrative directives, or like measures as are
directed to compliance with legal requirements or
attainment of the objects of Board policy. The
superintendent may appoint a designee to act on
his/her behalf subject to applicable legal restrictions.[47]

The Superintendent may hire consultants (such as the
consultant who filled some of Weaver's duties while he was on active
duty).[48] He may authorize non-exempt employee's overtime and develop
a policy on comp time.[49] He may assign duties and responsibilities to
school system employees, including setting the work schedules of
support personnel.[50] He is supposed to develop evaluation procedures
for non-certified personnel.[51]

The Superintendent is "authorized and directed" to implement
policies against discrimination.[52] He also is to establish and administer
a program of testing employees for alcohol or drugs.[53]

---

[47] The section is found at Policy Manual at 16.

[48] Policy 3.9.5, Policy Manual at 20.

[49] Policy 3.11.5 and 3.11.6, Policy Manual at 21-22.

[50] Policies 5.1.1 and 5.1.2, Policy Manual at 49-50.

[51] Policy 5.7.2, Policy Manual at 53. "Non-certified personnel" are those
without a teaching certificate issued the State Department of
Education.

[52] Policy 5.13.2, Policy Manual at 66.

[53] Policies 5.18.3 and 5.18.4, Policy Manual at 74-75.

57

The Superintendent determined where Weaver's office would be.[54]

The Board, acting on the recommendation of Superintendent Fowler, adopted a new organizational chart just about the time Weaver returned in 2007 and appointed Weaver as CSFO.[55]

Another way to look at the situation is to determine the type of function by determining what government required the function to be performed. In *Abusaid v. Hillsborough County Bd. of County Com'rs,* 405 F.3d 1298 (11th Cir. 2005), the Court held that "the arm of the state determination must be made on a function-by-function basis," and "a Florida sheriff does not act as an arm of the state in enforcing a county ordinance."[56] It follows that a local school board and superintendent are not acting as arms of the state if they are enforcing (or failing to enforce) a federal law (USERRA).

G.     What Degree of Control Does the State Maintain over a City Board of Education and Superintendent?

The vast bulk of the Defendants' brief appears to be devoted to recounting in great detail the regulations and laws applicable to the city and county boards of education. *See* Doc. 19 at PDF pages 22-53 and 70-74. But most of those rules are inapposite to the inquiry at hand. "The

---

[54] Fowler deposition 45:15-46:6.

[55] Fowler deposition 19:22-22:16, 47:4-48:7; Exhibit 1,Weaver Declaration at ¶ 28.

[56] *Abusaid,* 405 F.3d at 1304.

pertinent inquiry is not into the nature of [an entity's] status in the abstract, but its function or role in a particular context."[57] The appropriate question, therefore, is whether the Superintendent and Board of the Madison City Schools are wearing a "state hat" when they make decisions regarding the working conditions, salary, and job assignments of the chief schools financial officer ("CSFO") or the Executive Director of Finance & Business.[58]

The Alabama Code does not mention the position of Executive Director of Finance & Business but sets out the rules for the appointment and removal of a CSFO, the supervision of the CSFO by the local superintendent, and the CSFO's fiduciary responsibility to the local board. Ala. Code § 16-13A-4 and -5 (2011 Cumm. Supp.). The Code says nothing about the salary of the CSFO, the employees that he shall supervise, whether he can have other duties in addition to those of the CSFO, his office space, his office furnishings, or his general working conditions.

The Legislature does not appropriate funds for the salary of each system's superintendent or CSFO. The education budget does provide funds for teachers, principals, assistant principals, counselors, librarians, career technical education directors, and career technical

---

[57] *Manders,* 338 F.3d at 1308, quoting *Shands Teaching Hosp. & Clinics v. Beech St. Corp.,* 208 F.3d 1308, 1311 (11th Cir.2000).

[58] The Defendants do not shed any light on those questions. There is only one mention of the CSFO position in the entire brief (Doc. 19 at 46), and that paragraph does not deal with the questions at hand.

education counselors based on the Average Daily Membership (ADM) of each school system. Since the salary of each superintendent is negotiated by the board and superintendent,[59] it is not included in the state education budget, but can be paid from local funds or from the state budget allocation for "Other Current Expense."[60] Similarly, the salary of the CSFO is not set by the Legislature, and the local board can pay it from any non-encumbered funds at its disposal.[61]

> H.      Whence Cometh the Local School System's[62] Funds?

No case we have found establishes any hard and fast rules on the amount of state funds that tips this factor in favor of being "an arm of the State." The Supreme Court found the Mt. Healthy City School District to be "more like a county or city than it [wa]s like an arm of the State" even though it "receive[d] a significant amount of money from the

---

[59] *See, e.g.,* Yvonne T. Betowt, "Madison School Board awards superintendent $10K," The Huntsville Times, 18 July 2012, Exhibit E to Weaver Declaration. *See also,* Yvonne T. Betowt, "Madison School Board votes to extend superintendent's contract and raise salary," The Huntsville Times, 22 August 2012, Exhibit F to Weaver Declaration.

[60] See State Department of Education, "A Guide to State Allocation Calculations 2011-2012," Exhibit D to Weaver Declaration.

[61] See Exhibit 1, Weaver Declaration at ¶¶ 17, 19.

[62] "Local school system" means the superintendent and the board of education.

State."[63] How much is "significant"? The dictionary suggests that it means "a measurably or noticeably large amount."[64]

The Madison school system had total revenues of $85,048,421 in the fiscal year ending in September 2010. Of that sum, $42,604,316 was "State" revenue, $7,078,815 was "Federal," and $34,949,504 was "Local."[65] The State provided a "significant" portion of the money for the Madison City Schools,[66] but the Federal and Local were approximately half of the total.

"Local" revenue sources include sales taxes and ad valorem taxes levied at the local level (by the City of Madison or the Madison or Limestone County Commission).[67]

---

[63] *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280 (1977).

[64] See Merriam-Webster Online, http://www.merriam-webster.com/dictionary/significant.

[65] Deposition of Dr. Dee Fowler, Exhibit 2, page 17 (PDF page 20), attached as Exhibit 2. (The full deposition has already been filed as Doc. 16-5.)

[66] The figures for any other county or city system can be reviewed in the latest Alabama Education Report Card (http://www.alsde.edu/Home/Reports/SDEAnnualReports.aspx).

[67] Doc 16-5, deposition of Fowler at 9:19-12:6; Exhibit 1, Weaver Declaration at ¶¶ 20, 22.

I.    Who is Financially Responsible for Judgments Against the Local Board or Superintendent?

Here, the question is not whether the State provides **any** funding to the local school system but, rather, whether Madison City Board of Education has sufficient **non-State** funds to pay any monetary judgment.

In *Travelers Indem. Co. v. School Bd. of Dade County, Fla.,* 666 F.2d 505 (11th Cir. 1982), Travelers had hired and paid a new general contractor for a school building after the first contractor (Traveler's insured) had defaulted. Travelers sued the school board, claiming $139,000 for additional costs it had paid because of delays in construction which were the fault of the board. The court described the board's defense and its ruling thusly:

> [T]he county board and the state board were proceeding on the assumption that the proceeds from the state bond issue in an amount sufficient to complete this contract would be available for that purpose and that in response to any judgment against the county board it would use these state funds to discharge the indebtedness. These circumstances, it is claimed, created in the county board of education a status comparable to that of the protected state official in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

> The appellant, on the other hand, contends that the test laid down by *Edelman* is whether such a judgment must inevitably be satisfied from state funds. It contends that nothing in the record establishes the fact that the judgment entered in this lawsuit could be

satisfied only out of the state funds which were made available to the defendant board for that purpose.

We are satisfied that the record discloses that the county board had substantial other funds which were available for construction purposes without reference to the particular allotment of the state Capital Outlay Bond issue proceeds.

\*\*\*

… ***Edelman* makes it clear that the Eleventh Amendment protection is available only if satisfaction of the judgment sought against the state "agency" must under all circumstances, be paid out of state funds.** As we have already indicated, there is no contention, and no facts to support such a contention, if made, that there is any prohibition by state law or constitution that would prevent the county board of education from satisfying a judgment in this lawsuit out of county funds not in any way derived from the state of Florida. We, therefore, conclude that the appellee Board of Education of Dade County was not protected by the Eleventh Amendment.

*Travelers,* 666 F.2d at 506-07, 509 (emphasis added). Similarly, the *Stewart* Court held, "it cannot be said that a judgment against a county school board will come from state funds." *Stewart,* 908 F.2d at 1511. *See also, Schiff v. Williams,* 519 F.2d 257, 262 (5th Cir. 1975) (Eleventh Amendment did not bar backpay award because it would come from trust fund of student fees earmarked for student publications and thus would have no impact on state treasury); *Board of Sup'rs of Louisiana State University and Agr. and Mechanical College v. Ludley,* 252 F.2d 372, 376 (5th Cir. 1958) ("Full relief can be obtained from the named

defendants without requiring the State to take any affirmative action").

The Defendants' assertion that all school funds are "State funds" is rebutted by *Schiff*. In *Schiff,* the funds were held by the State, but were held in trust. In this case, the funds were not raised by the State, held by the State, or expended by the State. The label the State may place on funds – no less than the label it places on officials – cannot be binding on a Federal Court making a determination under the Federal Constitution. See *McMillian v. Monroe County, Ala.,* 520 U.S. 781, 786 (1997) ("This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy.").

Funds to pay the CSFO are not directly appropriated by the State. Therefore, such funds **can come** from local funds of the Madison City Schools.


**IV.    Even if the Eleventh Amendment Were Applicable, Weaver Could Still Seek Prospective Injunctive Relief.**

Weaver seeks both retrospective and prospective relief. The principal prospective relief sought by Weaver is requested in subparagraphs 29.c and d of the Complaint (Doc. 1 at 11):

> c. Grant a permanent injunction enjoining defendants, their officers, employees, agents, successors, and assigns, and all persons in active concert or participation with defendant, from engaging in employment practices which discriminate on the basis of uniformed service on such terms as the court may direct.

64

> d. Order defendants to reinstate plaintiff to the
> position of Executive Director of Finance & Business /
> Chief Schools Financial Officer (or a similar position)
> with at least the span of control, authority, duties,
> responsibilities, support staff, and type of office
> plaintiff had before his active duty in 2005, or such
> other position as required by 38 U.S.C. § 4313.

Other prayers for relief intertwine prospective and retrospective relief.

The Supreme Court has held that "[i]n determining whether the doctrine of *Ex parte Young*[68] avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."[69]  That "straightforward inquiry" shows that the Eleventh Amendment does not bar the relief cited above.

## V.    Conclusion.

Because the Court has subject matter jurisdiction pursuant to § 4323(b)(3) of USERRA, because state sovereign immunity is not a valid defense to USERRA claims, because the Board would not qualify as an "arm of the state" if such immunity were possible, and because Weaver could proceed with his "official capacity" claims for prospective

---

[68] *Ex parte Young,* 209 U.S. 123 (1908).

[69] *Virginia Office for Protection and Advocacy v. Stewart,* __ U.S. __, 131 S.Ct. 1632, 1639, 179 L.Ed.2d 675 (2011) (internal punctuation and alterations omitted).

injunctive relief even if sovereign immunity were applicable,

Defendants' motion should be denied in all respects.

a.

Submitted by,

/s/ Edward Still

Kathryn S. Piscitelli                     Edward Still
Harris & Helwig PA                    130 Wildwood Parkway, STE
6700 S. Florida Ave., Suite 31    108, PMB 304
Lakeland, FL 33813                    Birmingham AL 35209
863-648-2958                              Phone & fax: 205-320-2882
863-619-8901 (fax)                     email: still@votelaw.com
kpiscitelli1@cfl.rr.com               *Attorneys for the plaintiff*

CERTIFICATE OF SERVICE

I certify that on 4 September 2012 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following attorneys:

Carl Johnson Jr., Esq.
Bishop, Colvin, Johnson & Kent LLC
1910 1st Ave N.
Birmingham, AL 35203-4006
carljohnson@bishopcolvin.com

Hon. Joyce White Vance
US Attorney
US Attorney's Office
1801 4th Avenue North
Birmingham, AL 35203-2101
usa-aln-ecf-usa@usdoj.gov

Nathaniel S Pollock, Esq.
US Department of Justice
Appellate Section
Ben Franklin Station
PO Box 14403
Washington, DC 20044-4403
Nathaniel.Pollock@usdoj.gov

/s/ Edward Still