FILED

2015 Dec-23  PM 01:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL E. WEAVER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 5:11-cv-3558-TMP |
| | ) | |
| MADISON CITY BOARD OF | ) | |
| EDUCATION; DR. DEE FOWLER, | ) | |
| in his official capacity as Superintendent | ) | |
| of the Madison City Board of Education, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

This cause is before the court on the cross motions for summary judgment filed by the parties. On April 21, 2015, the plaintiff filed his Second Motion for Partial Summary Judgment (Doc. 90), while the defendants filed their Cross Motion for Summary Judgment on May 11, 2015 (Doc. 93). The motions have been fully brief and are ready for consideration. The parties have consented to the exercise of dispositive jurisdiction by the undersigned magistrate judge. (Doc. 114). The parties have not made a demand for trial by jury.

## I. **Summary Judgment Standards**

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." Id. at 249.  His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The evidence supporting a claim of affirmative defense must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact.  Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-50 (11th Cir. 2004).  If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination.  See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of the events is so utterly discredited by the record that no reasonable jury could believe him.  The Court of Appeals should not have relied on such visible fiction…."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the

drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. **Summary Judgment Facts**

Many of the facts submitted by the parties are undisputed.  Because there are cross motions for summary judgment, however, the factual differences between the parties must be treated in different ways, depending upon which motion is under consideration.  With respect to the plaintiff's motion for partial summary judgment, factual differences must be viewed favorably to the non-moving defendants.  In contrast, when the defendant's motion for summary judgment is under consideration, the differences are viewed favorably to the non-moving plaintiff.  As the court sets out the facts the parties do not dispute, it will also attribute factual differences asserted by the respective parties and apply those facts to the legal analysis in the manner described above.[1]

As a new school system, the Madison City Board of Education hired plaintiff, Michael Weaver, in April 1998, in preparation for becoming an operational school system on July 1, 1998.  Weaver was hired as the Executive Director of Finance and Business, and his employment was pursuant to a written contract negotiated with the then-superintendent, Dr. Henry J. Clark. (Fowler Ex. D, doc. 95-2).  The contract set plaintiff's annual compensation, payable in monthly

---

[1]  To differentiate the disputed factual statements asserted by the plaintiff from those asserted by the defendants, the court's statement of facts will include plain text to indicated undisputed facts, **bold text to indicate facts viewed favorably to the plaintiff**, and *italicized text to indicate facts viewed favorably to the defendant*.

installments, and provided for other employment-related benefits, such as reimbursement for moving expenses, a relocation allowance, various forms of insurance, and an automobile allowance.  The contract also stated that "The Executive Director of Finance and Business is entitled to all other benefits generally provided to other employees of the Madison City Board of Education."  The contract is undated and has no specific term or expiration date.  It also does not set any specific procedure or expectations for pay raises.

At the time Weaver applied for the position and was hired, a position announcement dated February 2, 1998, described the position as "Business and Financial Manager," involving "Contract length: 12 Months," and reporting to the superintendent.  (Fowler Ex. C, doc. 95-2). The position announcement also describe seventeen areas of responsibility assigned to the position, including "Administer[ing] the business and financial affairs of the school system," developing and preparing budgets, making bank deposits, "facilitat[ing] the investment and disbursement" of school funds under the direction of the superintendent, bidding for and purchasing supplies, maintaining capital improvements accounts, coordinating school system responses to state and federal audits, and conducting internal auditing.  **According to the plaintiff, after he was hired, he also was responsible for monitoring construction projects, transportation services, food service, and property accountability.**  *Defendants contend that the then-assistant superintendent, Dr. Fowler,*[2] *was responsible for monitoring construction projects and transportation services.*  **Plaintiff contends the position was the functional equivalent of an assistant superintendent in that he reported directly to the superintendent of schools,** *but the defendants assert the plaintiff was on the director level of the school system's*

---

[2]   At around the time of plaintiff's hiring in 1998 and for a period thereafter, Dr. Fowler was the assistant superintendent.  Upon Dr. Clark's retirement in 2006, Dr. Fowler was elevated to superintendent on January 1, 2007, after a brief period with an interim superintendent, Stephen Nowlin.

*organization and reported to the assistant superintendent, Dr. Fowler.* An organizational chart from prior to 2006 (Fowler Ex. N, doc. 95-2) shows the Executive Director of Finance & Business as reporting to the Assistant Superintendent, who in turn reported to the Superintendent. **Weaver has testified that he did not report to the assistant superintendent, but directly to Superintendent Clark.** (Weaver Declaration, doc. 111-3, p. 3). The Executive Director was at the same level as the "Director of Instruction," the "Director of Technology," and the "Director of Special Education," all of whom reported to the Assistant Superintendent.

In 1998, plaintiff's initial annual compensation was $79,950.00. His pay increased over time. **Prior to 2005, plaintiff received pay increases that "mirrored" the pay increases for the superintendent.** (Weaver Aff., doc. 90-4, p. 7) *According to the defendants, these raises were discretionary in nature and approved by Dr. Clark on the plaintiff's own recommendations.* (Fowler Aff., doc. 95-1, p. 4). *The lack of leadership by Dr. Clark and the large pay raises received by plaintiff resulted in a morale problem in the school district and made plaintiff the second highest-paid employee behind only the superintendent.* (Id.) The parties agree that some pay increases were the result of increases mandated by the State for non-teacher school system employees statewide. A handwritten chart (doc. 90-1, p. 37 (see also doc. 90-2, p. 63)) shows plaintiff's annual pay in July 2005 was $118,645.00, and in July 2007 was $133,298.46.

Before 2005, plaintiff's office was located on the upper floor of the school system's Central Office building, within twenty-five feet of the superintendent's office, and plaintiff had daily interaction with the superintendent, Dr. Clark. His office was furnished with "executive-level furniture." Plaintiff directly supervised an accounting specialist, who was responsible for day-to-day banking and accounting. He also supervised an employee (Ms. Marti Tatara)

responsible for day-to-day management of Child Nutrition Programs.  *Plaintiff currently supervises an accounting specialist, a payroll manager, and four bookkeepers*.

In 2003, the Alabama State Board of Education adopted a new rule requiring local school boards to have a "Chief School Finance Officer."  (Fowler Ex. R, doc. 95-2)  Plaintiff was identified as the Madison City school system's CSFO on July 28, 2003.  (Doc. 111-4).  The duties and responsibilities of the CSFO were described in a memorandum from Assistant State Superintendent Robert Morton dated June 19, 2003 (Weaver Declaration, Ex. D, doc. 111-4), as follows:

> 1. Maintain an accounting system in accordance with generally accepted accounting principles and governmental accounting standards.
> 2. Maintain a school payroll accounting system in accordance with applicable laws and regulations.
> 3. Prepare financial reports annually and at other times as requested by the local school superintendent, the local board of education, and other agencies.
> 4. Prepare reports as required by other agencies.
> 5. Maintain an adequate system of internal controls including property and inventory accounting.
> 6. Maintain a sound system of cash management.
> 7. Maintain a sound accounting system in the individual local schools.
> 8. Maintain a system of contracting and purchasing procedures.
> 9. Coordinate the preparation of the annual budget and any amendments as appropriate.
> 10. Maintain the financial operations of the child nutrition program and other special programs in accordance state and federal requirements.
> 11. Carry out assigned responsibilities in accordance with federal, state, and local laws and with applicable rules and regulations.
> 12. Perform other duties as may be assigned to the position by law, by the local school superintendent and local board of education, and by rules and regulations of the State Board of Education and the local government.

Additionally, the memorandum plainly stated that "The chief school finance officer does not have to be the custodian of school funds, chief accountant, finance director, or head bookkeeper. The school board can name any qualified employee or officer of the school system (except the superintendent) as the chief school finance officer, if the individual is responsible for the

financial management system of the board."  Plaintiff was named the CSFO for the Madison City schools.  **Plaintiff claims this position was in addition to his job as Executive Director of Finance and Business.**

Beginning in 2005, several employees of the school system filed complaints alleging harassment and hostile work environment against Weaver.  Three employees under the direct supervision of Weaver (Marti Tatara, Loree Spencer, and Teresa Hill) filed complaints, as did another employee not directly supervised by him (Jolie Ferguson).  (Fowler Aff., doc. 95-1, p. 5).  Ultimately, these complaints resulted in discipline against Weaver, consisting of suspension without pay for seven days, completion of an anger management course, apologizing to the employees involved, and changing other aspects of his work conduct.  (Id., p. 6).  This discipline was agreed to by Weaver in a formal written agreement dated July 22, 2005.  (Fowler Ex. J, doc. 95-2).  Additionally, some of the affected employees were allowed to request reassignment away from supervision by Weaver, and Marti Tatara, who managed the Child Nutrition Program, was reassigned from Weaver to then-Assistant Superintendent Fowler.

In September 2005, as a member of the United States Army Reserve, plaintiff was called up to active duty with the United States Army in Afghanistan.  Plaintiff gave advance notice of his activation to Dr. Clark.

In 2006, while the plaintiff was away on active duty, the Alabama Legislature enacted the "School Fiscal Accountability Act," (Ala. Acts 2006-196) which abolished the old position of Custodian of School Funds and mandated the appointment of a CSFO.  The Act specified that the CSFO must report directly to the superintendent and holds a fiduciary relationship with the board of education in each respective district.

**Near the end of his mobilization, in December 2006, plaintiff met with Interim Superintendent Stephen Nowlin to discuss plaintiff's return to the Madison City schools. Nowlin told him that the school board was unhappy with having to pay the differential between plaintiff's military pay and his compensation with the school board.[3] He testified also that the Board chairwoman, Sue Helms, and the Board's attorney, Sanderson, had made similar comments to him.**

In February 2007, plaintiff gave notice to Dr. Fowler (who had replaced Dr. Nowlin as superintendent on January 1, 2007) of his return from active duty. An email to staff announced plaintiff's return to the position of "Executive Director of Finance." (Weaver Declaration, Ex. E, doc. 111-8). During his absence on active duty, plaintiff's responsibilities had been divided between a contract consultant, David Smith, and the acting Chief School Financial Officer, Teresa Hill. **Soon, plaintiff began to notice that many of his former duties were being performed by others and that he was being excluded from "cabinet" activities. In the Spring of 2007, plaintiff was not informed of a trip to Minnesota to review technology, even though David Smith was invited and plaintiff's duties previously included review and supervision of technology issues related to finance. Prior to 2005, plaintiff had been sent on at least three trips involving the review of technology.** (Weaver Declaration, doc. 111-3, p. 5). **From 2007 to 2015, plaintiff was excluded from the Capital Planning Committee, over which he had overall responsibility before 2005. Upon his return in 2007, plaintiff was no longer responsible for strategic planning, salary analysis, or student-enrollment projections, all of which were handled either by Dr. Fowler or outside consultants.**

---

[3]   Alabama law requires school boards to pay the difference between a mobilized employee's military pay and his school-system pay while the employee is on active duty.

On May 11, 2007, plaintiff filed a series of administrative grievances against Superintendent Fowler, alleging that Dr. Fowler was using his position to obtain favors and perks from a Yearbook vendor; that he had violated USERRA by failing to reinstate plaintiff to his former position and responsibilities; that he and Board chairwoman, Sue Helms, were harassing plaintiff because he had performed consulting work with other school districts while on active duty; that the school-district organization proposed by Dr. Fowler was not workable and created communication problems; that David Smith was working beyond his authority as a consultant; that Dr. Fowler had sent him more than 30 racist and pornographic emails; and that certain employees were receiving unauthorized pay without withholding for Social Security and federal taxes.  (Weaver Declaration, Ex. C, doc. 111-6).  Dr. Fowler responded to the grievances on July 20, 2007, finding many of the matters not grievable, but taking action to correct some of the matters raised by plaintiff.  For example, plaintiff's automobile and life insurance premiums were reinstated.  (Id.).  Dr. Fowler also acknowledged that his previous reference to plaintiff as the "Executive Director of Finance" in the email announcing his return to work was an error and should have been Executive Director of Finance and Business.  (Id.).

In July 2007, Dr. Fowler recommended to the Madison City Board of Education a plan for reorganization of the Central Office staff.  That plan was approved by the Board on July 28, 2007.  *Plaintiff's title was changed from Executive Director of Finance and Business to Chief School Finance Officer, consistent with the mandate of the new state law.*  (Fowler Aff., doc. 95-1, pp. 9, 10).  Plaintiff replaced Teresa Hill, who had been acting CSFO.  *The CSFO position was substantially the same as his former position as Executive Director of Finance and Business. Part of the reorganization was to move managers physically closer to the staff they managed.*  (Fowler Aff., doc. 95-1, pp. 13-14).  *This resulted in plaintiff's office being moved to the first*

*floor of the building.  His office was furnished with functional equipment and furniture. Under the new organizational arrangement, plaintiff remained at the "Directors" level, as he was prior to 2005.  Although plaintiff was not included on the salary schedule for employees of the school district, he remained the second highest-paid employee, behind the superintendent.*  (Fowler Aff., doc. 95-1, p. 10).  *The CSFO position placed plaintiff in an enhanced position with a direct fiduciary duty to the Board, and he remained free to negotiate a personal employment agreement directly with the Board.*  (Fowler Aff., doc. 95-1, p. 11).  *Plaintiff's level of pay exceeded the maximum levels of pay provided on the salary schedule.*  (Fowler Aff., doc. 95-1, p. 11).

**In June 2009, despite being the CSFO, plaintiff was excluded from a trip to New York where representatives of the school system were meeting with bond underwriters and bond-rating agencies.  Consultant David Smith was asked to attend.**

Plaintiff's physical office also changed in 2007.  He was relocated from the office he formerly occupied on the upper floor of the Central Office building to an office on the first floor. **The office is about 30% smaller than his previous office, overlooks a loading dock, and it is not furnished with "executive-level" furniture.  Plaintiff's staff was reduced with the reassignment of Teresa Hill to the position of Purchasing Agent, leaving plaintiff without an Accounting Specialist to handle daily banking activities.  He also was not provided a secretary after 2009.**  *Even so, plaintiff's staff has increased from four employees to six since 2007.*  (Fowler Aff., doc. 95-1, p. 16).

Since 2006, the Madison City Board of Education has eliminated discretionary pay raises. All pay raises are the result of either legislative mandate or the salary schedule implemented in 2007.  No employees have received bonuses since 2006.  (Fowler Aff., doc. 95-1, p. 13).

### III.  Analysis of Motions

*A.  USERRA*

The Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA") prohibits employment discrimination on the basis of an employee's membership and service in the uniform services of the United States and establishes certain reemployment rights following such service.  Title 38 U.S.C. § 4311(a) states:

> (a) A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

"Congress enacted USERRA 'to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service' and 'to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers.'"  Dees v. Hyundai Motor Mfg. Alabama, LLC, 368 F. App'x 49, 50-51 (11th Cir. 2010) (quoting 38 U.S.C. § 4301(a)(1), (a)(2)).

The United States Court of Appeals for the Eleventh Circuit has described the method of proof required for a claim under § 4311(a) of USERRA as follows:

> To establish a prima facie case under USERRA, a plaintiff must "show by a preponderance of the evidence that his protected status was a motivating factor," but that status need not be the sole cause as long as "it is one of the factors that a truthful employer would list if asked for the reasons for its decision."  Coffman v. Chugach Support Servs., Inc., 411 F.3d 1231, 1238 (11th Cir. 2005) (citation and quotation omitted).  "Indeed [m]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration."  Id. (quotation omitted).  Because "discrimination is seldom open or notorious," circumstantial evidence is critical, and "[t]he court can infer

discriminatory motivation under the USERRA from a variety of considerations," such as:

> proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

Id. (quotation omitted).  "When the employee has met this burden, the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." Id. at 1238–39.  Thus, in USERRA actions, "the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status." Id. at 1239 (quotation omitted).

Dees v. Hyundai Motor Mfg. Alabama, LLC, 368 F. App'x 49, 51 (11th Cir. 2010); Ward v. United Parcel Service, 580 F. App'x 735, 738 (11th Cir. 2014).

Of particular importance to this case are the provisions of § 4312, which provide for reemployment rights following active-duty service.  An employee is entitled to reemployment if (1) the employee engaged in active uniformed service, (2) gave advance notice of such service to his employer, (3) promptly returns or re-applies for employment upon completion of the service, (4) was discharged "honorably" from service, and (5) his total non-exempt service does not exceed five years.

> Veteran reemployment statutes "date from the nation's first peacetime draft law, enacted in 1940." Leib v. Georgia–Pacific Corp., 925 F.2d 240, 242 (8th Cir. 1991). Congress intended for "[t]he statutory right to reinstatement ... to bolster the morale of those serving their country and to facilitate their reentry into the highly competitive world of job finding without the handicap of a long absence from work." Id. (quotation and citation omitted).  Unlike section 4311, this provision [§ 4312] does not require an employee to show any discriminatory animus.  See Wrigglesworth, 121 F.Supp. 2d at 1134–35.

<u>Coffman v. Chugach Support Servs., Inc.</u>, 411 F.3d 1231, 1235 (11th Cir. 2005).  Reemployment procedures and rights are further defined in § 4313.   Because plaintiff's military service exceeded 90 days, the part of § 4313 applicable to this case is § 4313(a)(2), which states in relevant part:

> (a) Subject to subsection (b) (in the case of any employee)[4] and sections 4314 and 4315 (in the case of an employee of the Federal Government), a person entitled to reemployment under section 4312, upon completion of a period of service in the uniformed services, shall be promptly reemployed in a position of employment in accordance with the following order of priority:
>
> * * *
>
> (2) Except as provided in paragraphs (3) and (4),[5] in the case of a person whose period of service in the uniformed services was for more than 90 days—
>
> (A) in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a position of like seniority, status and pay, the duties of which the person is qualified to perform; or
>
> (B) in the position of employment in which the person was employed on the date of the commencement of the service in the uniformed services, or a position of like seniority, status and pay, the duties of which the person is qualified to perform, only if the person is not qualified to perform the duties of a position referred to in subparagraph (A) after reasonable efforts by the employer to qualify the person.

Reemployment under USERRA involves more than simply a return to the same job the employee held prior to leaving for active service.  The regulations promulgated under USERRA

---

[4]   Subsection (b) deals with the circumstance in which more than one person entitled to reemployment rights under USERRA seek reemployment to the same position.  That does not exist in this case.  Also, because plaintiff is not an employee of the Federal government, neither §§ 4314 nor 4315 applies.

[5]   Paragraphs (3) and (4) of § 4313 do not apply in this case.  Paragraph (3) deals with the reemployment rights of persons who become disabled during uniformed service, and paragraph (4) deals with persons who are otherwise not qualified for the positions described in the statute.  Neither of these conditions applies in this case.

have recognized an "escalator" principle inherent in § 4313(a)(2)(A).  "A key provision of USERRA's reemployment protections is the 'escalator principle,' which 'requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of [military] service.'"  Fannin v. United Space All., L.L.C., 2009 WL 139878, at *6 (M.D. Fla. Jan. 20, 2009), aff'd in part sub nom. Fannin v. United Space All., LLC, 392 F. App'x 788 (11th Cir. 2010) (quoting 20 C.F.R. § 1002.191).  This principle recognizes that active military service interrupts the employee's career advancement.  But for the period of active service, there may a reasonable certainty that the employee would have advanced, received promotions, and otherwise enhanced his employment position.  The escalator principle requires the employer to recognize this fact, where such advancement is reasonably certain, and reemploy the returning veteran in the position he would have occupied but for the time lost in military service.  The court in Fannin explained:

> The Supreme Court has held that, under USERRA, the employers' obligation to rehire means "the returning veteran should step back onto the seniority escalator" at the "precise point he would have occupied had he kept his position continuously during the [military deployment]."  Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 284–85, 66 S. Ct. 1105, 90 L. Ed. 1230 (1946).  USERRA's regulations explain that this "escalator position" means that "the employee is entitled to reemployment in the job position that he or she would have attained with reasonable certainty if not for the absence due to uniformed service," i.e., reemploying the servicemember "in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of service," 20 C.F.R. § 1002.191.  The Supreme Court has described the escalator principle as protecting a servicemember "against receiving a job inferior to that which he had before entering the armed services," Fishgold, 328 U.S. at 284.

Fannin v. United Space All., L.L.C., 2009 WL 139878, at *8 (M.D. Fla. Jan. 20, 2009), aff'd in part sub nom. Fannin v. United Space All., LLC, 392 F. App'x 788 (11th Cir. 2010); see also

Rogers v. City of San Antonio, 392 F.3d 758, 763 (5th Cir. 2004) ("USERRA requires that the service member be reemployed in the escalator job position comparable to the position he would have held had he remained continuously in his civilian employment.").   Whether a position offered to a returning veteran is of like status to the position to which he is entitled under USERRA involves consideration of multiple factors.   "The Court is to consider six factors in evaluating if an offered position for reemployment is of like status: (1) opportunities for advancement (2) general working conditions (3) job location (4) shift assignment (5) rank and (6) responsibility.  20 C.F.R. § 1002.194.  The Court must also consider whether seniority is the same."[6]  Fannin, *supra*, at *7 (citing 20 C.F.R. § 1002.193) [punctuation as in original].   As noted above, however, an employer's failure to reemploy the returning veteran in the proper position as required by §§ 4312 and 4313 does not involve any necessity for showing discriminatory animus.  Coffman v. Chugach Support Services, Inc., 411 F.3d 1231, 1235 (11th Cir. 2005).   It is a statutory duty imposed upon the employer regardless of the employer's motivation.   The burden is on the employer to offer the reemployment position, even in the absence of evidence that the returning employee will take it.   See United States v. Alabama Dep't of Mental Health & Mental Retardation, 673 F.3d 1320, 1330 (11th Cir. 2012) ("Under the plain language of USERRA, 'the employer has a duty to offer the employee' a position. There is no requirement that the employee prove that he would have accepted the position had it been offered.").

Notwithstanding the statutory duty to reemploy the returning employee, USERRA is not blind to dynamic changes in the workplace that might occur during the employee's absence.

---

[6]   Some courts have added a seventh factor of geographical location.  See, e.g. Bagnall v. City of Sunrise, Fla., 2011 WL 3715123, at *7 (S.D. Fla. Aug. 24, 2011).

> [A]n employer is permitted to take into consideration changes in the workplace during an employee's period of military leave.   The USERRA regulations recognize that an employer's reemployment offer may be affected by changes in staffing or work priorities, so long as the returning employee maintains the seniority and job classification he would have held if he had been employed during his period of military service.   See 20 C.F.R. § 1002.194 ("The reemployment position may involve transfer to another shift or location, more or less strenuous working conditions, or changed opportunities for advancement, depending upon the application of the escalator principle.").

Fannin v. United Space Alliance, L.L.C., 2009 WL 928302, at *6 (M.D. Fla. Apr. 3, 2009).

Unlike the connotation left by the reference to the "escalator" principle, USERRA does not guarantee that a returning employee's position is necessarily higher or better than the one he left. Escalators go up *and* down.[7]   The purpose of the escalator principle is not to assure that returning employees will always move up in status and pay, but, rather, that the positions to which they return reasonably approximate what would have occurred if the military leave had not interrupted the progression of the employment position.   See Serricchio v. Wachovia Securities LLC, 658 F.3d 169, 175 (2d Cir. 2011) ("[The 'escalator position'] can also lead to demotion or transfer, depending upon any intervening events during the servicemember's period of active duty.") (citing 20 C.F.R. § 1002.191).

---

[7]   As the First Circuit Court of Appeals remarked:

> The escalator does not run in only one direction. Depending on the particular employee's (and the employer's) circumstances, "the escalator principle may cause an employee to be reemployed in a higher or lower position, laid off, or even terminated." Id. § 1002.194.   In some cases, for example, the escalator principle could deliver an employee into "layoff status" if the "employee's seniority or job classification would have resulted in the employee being laid off during the period of service, and the layoff continued after the date of reemployment. Id."

Rivera-Melendez v. Pfizer Pharm., LLC, 730 F.3d 49, 55 (1st Cir. 2013).

*B.  Plaintiff's Motion for Partial Summary Judgment*

Plaintiff seeks partial summary judgment (doc. 90) in the form of a finding that the defendant Board of Education, in violation of §§ 4312 and 4313(a)(2)(A), failed to reemploy him in a job with "like seniority, status, and pay" to the job he would have held but for being mobilized to active duty in 2005.  On this claim, it appears to be undisputed that, upon his return to employment in February 2007, Weaver returned to a position with the same title and pay as he held when he started his military leave.[8]  Plaintiff contends, however, that that Executive Director of Finance and Business was not the *only* position he held, but that at time he left in 2005, he also was the Chief School Finance Officer.  These were two distinct positions, he asserts.  Upon his return in February 2007, Teresa Hill was the acting Chief School Finance Officer ("CSFO"), and she continued to hold that position until July 2007, five months after his return.  Furthermore, he argues that the status, responsibilities, prestige, and pay associated with the position of Executive Director of Finance and Business were greatly diminished after his return.

In analyzing the plaintiff's motion, the court is required to view the evidence favorably to the non-moving defendant, and in doing so, it is clear there are genuine issues of fact precluding a finding of summary judgment in favor of the plaintiff.  The ultimate question is whether the defendant Board reemployed plaintiff in a position of "like seniority, status, and pay" to the position he would have held had he never gone on military leave.  Given changes that occurred in the workplace during plaintiff's leave or soon thereafter, such as the enactment of School Fiscal Accountability Act, the advent of a new superintendent, and the reorganization of the

---

[8]   Although the email announcing his return referred to his position as "Executive Director of Finance," Dr. Fowler admitted in response to plaintiff's May 2007 grievances that this was an error, as his correct title was "Executive Director of Finance and Business."

Central Office staff, there are genuine questions about the status and pay of the position he returned to in 2007.

Although it is true that Weaver was designated the CSFO for the defendant Board in 2003 under the rule enacted by the Alabama State Board of Education, the nature of the position changed in 2006 (while Weaver was on leave) with the enactment of a state law mandating the appointment of a CSFO in every school district. This statute expressly made the CSFO directly answerable to the superintendent of each district and a fiduciary with respect to the Board. It is not clear the position of CSFO held by Weaver prior to his mobilization possessed the same duties, responsibilities, and status as that later created by statute. Moreover, the statutory mandate could well have justified the reorganization of the Board's staff to recognize separate roles for the CSFO and the Executive Director of Finance and Business. The escalator principle does not necessarily require a finding that Weaver was entitled to retain both positions after the legislative mandate occurred, even though he subsequently was awarded the CSFO position as part of the Board's July 2007 reorganization. There is a genuine issue of fact concerning the degree of overlap between the two positions prior to the reorganization.

When Weaver returned to employment, he returned as the Executive Director of Finance and Business, under the same contract he had worked under since his initial hiring in 1998. Although he received discretionary pay raises in many years between 1998 and July 2007, the contract did not provide for raises or a procedure for determining how and whether the discretion to give him a raise would take place. Since the reorganization in July 2007, all employees of the Board, except the superintendent and plaintiff, were on a salary schedule with set "steps" for pay increases over time. Plaintiff's position as Executive Director of Finance and Business was not on the salary schedule because his compensation was defined by a separate written contract that

paid him well above the top of the salary schedule.   He has received all general and state-mandated raises since 2007.

The escalator principle cannot be viewed as mandating that plaintiff be guaranteed discretionary pay raises into the future *ad infinitum*.   Changes of circumstance occur in every workplace, and such changes are the very fodder of the discretion exercised by an employer. Here, there was a reorganization of the Board's employees and the establishment of a salary schedule that simply could not be applied to plaintiff due to the size of his existing compensation.   Discretion necessarily means that the employer must be left with the decision whether to given raises or not.   The exercise of that discretion may or may not be discriminatory, but that is a separate issue from whether the employer reemployed a returning veteran in a position of "like status and pay" to his escalator position, particularly when the escalator position carried no guarantee of pay raises.

There also are genuine issues of fact concerning whether plaintiff's duties and responsibilities were so diminished upon his return in February 2007 that his position as Executive Director of Finance and Business simply did not possess the same status as before his military leave.   Plaintiff points to evidence that many of his previous duties and responsibilities, such a long-range planning, investments, and technology review, were assumed by other people. He offers evidence that his staff was reduced and his office space moved and diminished in size and prestige.   On the other hand, viewing the evidence favorably to the non-moving Board of Education, Dr. Fowler has testified that the Central Office staff was in the process of undergoing a reorganization from February to July 2007, when the new organizational structure was approved by the Board of Education.   The elevation of Dr. Fowler to the superintendent's office on January 1, 2007, created the possibility that the new superintendent would seek to implement

his own ideas about the structure of the Central Office and the duties of its staff.  This reorganization involved shifting responsibilities to better use the resources of the Board employees.  Moreover, he has testified that the CSFO position to which plaintiff was assigned after the reorganization was at least substantially the equivalent of the former position as Executive Director of Finance and Business.  There is evidence that the new CSFO position had even greater status in that the CSFO reported directly to the superintendent, not the assistant superintendent as had the Executive Director of Finance and Business, and held a fiduciary position with the Board itself.

Again, this is viewing the evidence favorably to the non-moving party, and on that view of the evidence, the court cannot say as a matter of law that plaintiff was not reemployed to an appropriate escalator position upon his return to work in February 2007.  There are genuine issues of fact concerning the status and pay of plaintiff's reemployment position that preclude summary judgment.  Plaintiff's motion for partial summary judgment is DENIED.

### C. Defendants' Motion for Summary Judgment

For purposes of consideration of this motion (doc. 93), the court must view the evidence favorably to the non-moving plaintiff, but the same genuine issues of material fact preclude summary judgment.  As noted above, plaintiff has presented evidence that, upon his return to work in February 2007, he was not given the CSFO position he previously held along with the position of Executive Director of Finance and Business.  Even with respect to the position of Executive Director of Finance and Business, there is evidence that his previous responsibilities and duties were diminished.  He was removed from long-range planning, excluded from technology-review travel, and excluded from a meeting with bond underwriters.  Even after his July 2007 appointment to the CSFO post, his duties and status remained less than before his

military leave.  He was moved to a less prestigious office space and excluded from committee meeting he previously chaired.  Again, viewing the evidence favorably to the non-moving plaintiff, there are genuine issues of material fact that preclude granting summary judgment to the defendants on plaintiff's claim under §§ 4312 and 4313(a)(2)(A).

Insofar as plaintiff asserts a separate claim for willful discrimination under § 4311, there also remain genuine issues of fact that preclude summary judgment.  Plaintiff has established a *prima facie* showing of discrimination, offering evidence that the interim superintendent (Nowlin), the chair of the Board of Education (Helms), and the Board's attorney (Sanderson) all expressed to him the displeasure of the Board that it was required to pay him his full salary while he was away on military leave.  That displeasure manifested itself in his diminished duties, responsibilities, and status upon his return to work in February 2007.  While the defendants have also offered evidence of legitimate reasons for various actions taken that had the effect of limiting plaintiff's role in the Madison City school system, these are all subject to genuine issues of fact as well.  For example, plaintiff has offered evidence that he has received no additional discretionary raises since 2007, even though he consistently received such raises in prior years and the superintendent has received discretionary raises since 2007.  He also has offered examples of various finance-related activities from which he has been excluded, notwithstanding his current position as CSFO.  Defendants' motion for summary judgment is DENIED.

DONE this 23rd day of December, 2015.

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE