FILED

2016 Dec-13  AM 10:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **MICHAEL E. WEAVER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | **Case No. 5:11-cv-03558-TMP** |
| ) | |
| **MADISON CITY BOARD OF** ) | |
| **EDUCATION and DR. DEE FOWLER,** ) | |
| **in his official capacity as** ) | |
| **Superintendent of the Madison City** ) | |
| **Board of Education,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

This cause came before the court for a non-jury bench trial on the plaintiff's claims alleging violation of his rights under the Uniform Services Employment and Re-Employment Rights Act, 38 U.S.C. § 4301 *et seq.* ("USERRA"). In particular, the plaintiff, Michael Weaver, asserts that the defendants failed to re-employ him in the position to which he was entitled upon his return from military service, in violation of 38 U.S.C. § 4313, and actively discriminated against him due to his military service, in violation of 38 U.S.C. § 4311. Having heard the testimony and

evidence proffered by the parties, and having received the briefs submitted by counsel, the court[1] now enters its findings of fact and conclusions of law.

## Background

To begin, the parties agree that certain facts are not in dispute. Weaver was hired as the Executive Director of Finance and Business for the Madison City Board of Education ('the Board") in April 1998 and has been an employee continuously since that time. During the majority of his employment with the Board, Weaver was a member of the United States Army Reserve, in connection with which he was called to active duty several times. Weaver's first deployment was in 2005-07. He gave advance notice to the superintendent and other appropriate officials each time he was activated for military service, and he timely requested return to active employment with the Board after completion of each such service. The combined length of Weaver's periods of federal military service during his employment relationship with the Defendants (minus periods exempted by 38 U.S.C. § 4312(c)) did not exceed five years. Each time Weaver was released from active duty, his service was characterized as "honorable."

---

[1]   The parties consented to the magistrate judge's dispositive jurisdiction pursuant to 28 U.S.C. § 636(c). *See* Doc. 114.

<u>Findings of Fact</u>

1.  The Madison City Board of Education ("the Board") was created in the spring of 1998, but did not fully separate from the Madison County Board of Education system until July 1, 1998.  The first superintendent hired by the Board was Dr. Henry J. Clark, III.  When the new system became operational on July 1, 1998, it had approximately 4,800 students.

2.  In February 1998, Weaver interviewed with Dr. Clark in connection to a posted job vacancy for a "Business and Financial Manager."  (Plaintiff's Ex. 32).  On February 9, 1998, Weaver wrote a letter to Dr. Clark as a follow-up to his interview.  (Plaintiff's Ex. 30).  As a result of the interview, Dr. Clark hired Weaver as the second employee (after Dr. Clark) of the new school system.

3.  Weaver and Dr. Clark negotiated a contract for Weaver's employment.  (Plaintiff's Ex. 33).  The contract provided Weaver with the title of Executive Director of Finance and Business.  It set an initial annual salary, payable in monthly installments, but provided no express mechanism for raises or salary adjustments.  The contract also provided additional compensation benefits, such as a life insurance policy, a monthly automobile allowance, payment of moving expenses, and payment of dues and expenses for Weaver to attend "professional meetings."  The contract provides no term or end date, nor does it set any provisions or options for renewal of the contract.

4.  For the first few months of the new school system, Weaver was tasked by Dr. Clark with a multitude of jobs, from financial matters to setting up a student transportation system to examining the need for buildings.  As more staff was hired, however, many of these tasks were transferred to others.  For example, Dr. Dee Fowler was hired and took the title Director of Administration and Operations before July 1, 1998.  He took over transportation, facility construction and maintenance, and personnel matters.  For construction projects, Dr. Fowler oversaw the construction planning and activities, while plaintiff Weaver determined the budget for the project and paid the bills.

5.  Weaver's principal responsibilities involved preparation of the school system's annual budget and long-range planning.  Long-range planning involved updating annually the school system's five-year plan anticipating growth and the needs of the system five years into the future.  Weaver also supervised the business staff, who were responsible for receiving and documenting revenue, paying bills, and supervising the bidding of contracts and purchases.

6.  In those early years, Dr. Clark's management style was to meet individually with his senior managers, including Weaver, Fowler, and others, rather than hold staff meetings.  Although an organizational chart for that time showed Weaver reporting to the Assistant Superintendent, there was no Assistant

Superintendent, and both Weaver and Fowler reported directly to Superintendent Clark.

7.   From his hiring in 1998 to at least 2005, Weaver was responsible for researching and making pay-raise recommendations to Dr. Clark.  There was no standard scale or step system by which employees' compensation was increased over time.  Rather, Weaver would research the Consumer Price Index, the rate of inflation, and other factors before making recommendations to Dr. Clark for pay increases for himself and other employees of the system.  Dr. Clark then presented the recommendations to the Board for approval.

8.   From 1998 to 2006, Weaver's salary increased from approximately $80,000 to over $124,500.  Plaintiff has remained the second highest paid employee in the Madison City system, behind only the superintendent.   Dr. Fowler's initial contract set his base pay in 2007 as $137,500 per year.  (Plaintiff's Ex. 54).

9.   In 2003, Dr. Fowler became the Assistant Superintendent of the school system.  In this position, he became Weaver's supervisor in that all of the directors in the system then reported to the Assistant Superintendent, who in turn reported to Superintendent Clark.  Nonetheless, Dr. Clark continued to meet one-on-one with Weaver.

10.   On May 8, 2003, the Alabama State Board of Education mandated by regulation that each school district have a Chief School Financial Officer.  In a memorandum dated June 19, 2003, the State School Board announced the following:

> Alabama school boards are required to have a chief school finance officer who meets the qualifications and certification requirements established by the State Department of Education (SDE).  The chief school finance officer does *not* have to be the custodian of school funds, chief accountant, finance director, or head bookkeeper.  The school board can name any qualified employee or officer of the school system (except the superintendent) as the chief school finance officer, if the individual is responsible for the financial management system of the board.  The duties and responsibilities of a chief school finance officer are contained in Rule 290-2-5-.02 of the *Rules of the State Board of Education*.  [Italics in original].

Rule 290-2-5-.02 of the *Rules of the State Board of Education* defined the duties and responsibilities of the Chief School Finance Officer as follows:

> 290-2-5-.02 <u>Duties and Responsibilities of Chief School Finance Officers</u>.  The chief school finance officer is responsible for a financial management system that ensures the proper accountability for funds administered by a local board of education and its schools.  The financial management system shall reflect the financial condition of the local board of education on a timely and accurate basis.  The local board of education shall provide the resources necessary for the chief school finance officer to operate an effective financial management system.
>
> (a)      An effective financial management system will require the chief school finance officer and other personnel to:

1.   Maintain an accounting system in accordance with generally accepted accounting principles and governmental accounting standards.

2.   Maintain a school payroll accounting system in accordance with applicable laws and regulations.

3.   Prepare financial reports annually and at other times as requested by the local school superintendent, the local board of education, and other agencies.

4.   Prepare reports as required by other agencies.

5.   Maintain an adequate system of internal controls including property and inventory accounting.

6.   Maintain a sound system of cash management.

7.   Maintain a sound accounting system in the individual local schools.

8.   Maintain a system of contracting and purchasing procedures.

9.   Coordinate the preparation of the annual budget and any amendments as appropriate.

10.   Maintain the financial operations of the child nutrition program and other special programs in accordance state and federal requirements.

11.   Carry out assigned responsibilities in accordance with federal, state, and local laws and with applicable rules and regulations.

12.   Perform other duties as may be assigned to the position by law, by the local school superintendent and local board of education, and by rules and regulations of the State Board of Education and the local government.

Plaintiff Weaver was certified by Superintendent Clark as the Chief School Finance Officer for Madison City Schools on July 28, 2003.  (Plaintiff's Ex. 41).

11.   Before 2006, there also was a position known as the Custodian of School Funds, who was a subordinate of and supervised by Weaver as the Executive Director of Finance and Business.  The Custodian of School Funds was

principally responsible for processing payment of school payrolls upon certification by the superintendent.

12. Beginning in 2004 or 2005, Superintendent Clark became "disengaged" from active leadership of the Madison City school system. Both the plaintiff and Dr. Fowler testified to frustrations they experienced because Dr. Clark became less interested and active in leading the school system. As a result, both Weaver and Dr. Fowler agreed that several senior management employees, including both of them, tried to "fill the vacuum" of leadership by taking on new and additional responsibilities. This caused tension among the senior staff and other employees as it was not always clear where the lines of authority and responsibility ran. The school system began to decline.

13. In 2005 several employees filed a number of grievances against plaintiff Weaver. In January 2005, Jolie Ferguson filed a grievance describing three incidents in which she believed Weaver was disrespectful toward her, "boarder[ing] on hostility" [sic]. (Defendants' Ex. 8). Beginning in February 2005, Loree Spencer filed a series of grievances alleging sexual harassment and intimidation by Weaver. (Defendants' Ex. 9). Also beginning in February 2005, Martha Tatara filed a series of grievances alleging that Weaver had yelled at her and humiliated her in a committee meeting and was otherwise verbally harassing her. (Defendants' Ex. 10). In July 2005, Teresa Hill filed a grievance alleging that

Weaver was rude, unprofessional, and intimidating toward her, and that his irregular office hours put pressure on the business staff to complete tasks in a timely manner.  (Defendants' Ex. 11).

14.  On July 22, 2005, Dr. Clark suspended Weaver without pay for seven days and issued a written reprimand, saying in part that six formal grievances had been filed against him and that:

> Specifically, behaviors that have been described by one or more of the complaining employees include offensive or inappropriate comments of a sexual nature, offensive touching of a sexual nature, inappropriate invasion of the personal space of complainants, conducting a "threatening method of management," erratic or irrational behavior, "irrational hostility toward any woman who questions you or your "orders," unreasonable demands placed on your employees and time-crunches occasioned by your recurring absences during the regular work day and late night working habits, being "cussed at, yelled at and verbally humiliated in front of people" and unsubstantiated accusations of wrongdoing by employees.
>
> As you know, Dr. Fowler and I conducted a verbal counseling session with you on May 24 in which you were informed that any inappropriate, abusive or hostile behaviors were to cease immediately. The complainants who had filed grievances at that time were informed that any further problems with your behavior should be reported to me.
>
> Since our meeting in May, two additional formal grievances have been filed and two of the previous grievances have been appealed to the Board.  Complainants have alleged that your inappropriate behaviors have not only continued but they also allege that they believe that you have sought to retaliate against them for bringing their grievances in the first instance.  As you know, retaliation for the filing of a grievance is a violation of policy GAE.

9

* * *

After review of the grievances submitted to me and discussions with the various employees who have complained about your behavior I find that the complaints are credible and relate behavior that is unacceptable in this or any other work environment.  You have been previously verbally warned about your inappropriate behaviors yet those behaviors have recurred.  This is a very serious matter and it requires a serious response.

Your behaviors require me to issue this written reprimand which is to be placed in your personnel file.  You are expressly warned that any and all behaviors in which you may engage that harass, intimidate, abuse, threaten, demean, humiliate, embarrass, belittle, or degrade any employee of this system will not be tolerated whatsoever and any additional reports of such behaviors on your part, if substantiated, will lead to more severe discipline, to include dismissal from employment.

* * *

(Defendant's Ex. 14).  On July 22, 2005, Weaver also signed and entered into a formal disciplinary agreement in which he agreed to the seven-day suspension without pay, to apologize to three co-employees, to enroll in an anger management counseling program, to conform his work hours to regular work hours, to limit his use of work computers to internet sites related to his work, and to accept a formal written reprimand.  (Defendant's Ex. 15).

15.  On August 8, 2005, plaintiff received notice that he was being called up for active duty with the Army Reserve, with a reporting date of September 6, 2005. (Plaintiff's Ex. 4, Bates No. 703 of 921).  The activation was for 545 days. Weaver timely notified Dr. Clark of his activation.

16.    During plaintiff's deployment in 2006, Dr. Clark retired and was replaced by an interim superintendent, Stephen Nowlin.  Dr. Nowlin's contract was for the time period from June 2006 through the end of the year, during which the Board would seek a permanent superintendent.

17.    During the plaintiff's deployment, his duties and responsibilities were divided among a number of employees, as well as a financial consultant, David Smith, engaged by the Board.  Teresa Hill became the Interim Chief School Finance Officer, and the consultant assisted with other financial matters, including facilities, building projects, and related bond issues.

18.    On March 9, 2006, while Weaver was on deployment, the Alabama Legislature adopted Act No. 2006-196, which, among several things, codified the position of Chief School Finance Officer.  At that time, Teresa Hill was acting as the Interim Chief School Finance Officer, being advised and assisted by the consultant, David Smith.   Before Weaver's deployment, Hill had been an accounting specialist, working under plaintiff's supervision.

19.    Late in 2006, as Weaver began to approach the end of his deployment, he notified Dr. Nowlin of his plan to return to his position of Executive Director of Finance and Business in early 2007.   In November 2006, the Army notified Weaver that it would extend his deployment.  At a lunch in December 2006, Dr. Nowlin expressed the Board's concern with the extension of Weaver's

deployment, and he told Weaver that the school board president, Sue Helms, was concerned that Alabama law required the Board to continue to pay Weaver the difference between his school salary and his military pay while he was on deployment.

20.  During this same time period, Weaver had telephone conversations with both Helms and the school board attorney, Woody Sanderson, in which both expressed concerns about the Army's request that Weaver extend his deployment. They urged him to seek to rescind an extension of his deployment because he was needed in his position with the school system and because the pay differential caused hardships.  Weaver successfully persuaded the Army not to extend his deployment and he was released from active duty February 7, 2007.

21.  On January 1, 2007, Dr. Fowler became the Superintendent of the Madison City schools, succeeding the interim superintendent, Dr. Nowlin.

22.  On February 13, 2007, Dr. Fowler announced by email Weaver's return to work with the system.  His email stated in part:

> During the time that Mike [Weaver] was gone the state passed the School Fiscal Accountability Act.   This act established many procedures and job descriptions, and abolished the position of the Custodian of the School Funds, providing that every district should have a Chief School Financial [sic] Officer.   The CSFO is responsible for the following: verifying receipt of funds, verifying payment of funds, keeping an accurate record of all expenses, and providing reports and information to the Board.   The CSFO reports to the Superintendent and is a contract employee of the Board.   The CSFO is

one of only three positions that the Board actually hires without recommendation of the superintendent.  Teresa Hill is the CSFO of the district.  Mike will continue in his role as Executive Director of Finance.  As you can see some of his former roles have been removed by law.  Yesterday Mike and I sat down and discussed his new job description.   I will give you a few quick items that Mike will be performing the following functions: verifying reports, assisting in budgets and planning, supervising the business office (but not the CSFO), assisting in capital planning, managing insurance and investment programs, assisting principals in budgeting, maintaining inventory, and acting as purchasing manager. That is the down and dirty.

* * *

David Smith will continue to remain as a consultant for several weeks helping Mike transition to his job.  When that time is over he will still help with projects.  The first project is a look at our salary schedule. Mr. Smith, with help form [sic] the personnel office (Mr. Jones), should have a new salary schedule recommendation this spring.

I am working on an organizational chart for the Board.  When it is approved and we re-organize I'll get that information to you.

(Plaintiff's Ex. 45).  Dr. Fowler prepared a job description for the position of "Executive Director of Finance," referenced in the email (Plaintiff's Ex. 39), but it was never presented to or adopted by the Board.  He did so because Weaver became concerned about his duties and responsibilities in the planned reorganization of the staff.

22.   Upon assuming the position of superintendent, Dr. Fowler began working on a plan to reorganize the school system staff.  The purpose of the plan was to more clearly define the structure and lines of supervision and reporting

within the system staff.   The position of Executive Director of Finance and Business was replaced with the position of Chief School Finance Officer, who, although nominally under the Chief Operating Officer, reported directly to the Superintendent and the Board itself.  Other former director-level positions, such as Director of Instruction, also were replaced or divided into two or more positions. This reorganized structure was approved and adopted by the Board on July 25, 2007.  (Plaintiff's Exs. 34 and 35).

23.   From February 2007 until the reorganization was adopted in July, Weaver was the Executive Director of Finance and Business, Teresa Hill was the interim Chief School Finance Officer, and David Smith was a financial consultant under contract with the Board, but not a Board employee.

24.  On June 22, 2007, Dr. Fowler received eight formal grievances from the plaintiff, all dated May 11, 2007.   Several of these were related to the staff structure and proposed re-organization.   In one, he alleged that he was being denied his rights under USERRA, asserting that Helms, Sanderson, and Interim Superintendent Nowlin had expressed displeasure at his military deployment, and that he had "not been brought back to the same scope, job description, and/or pay and benefits as I had prior to my departure for active duty."   In another grievance, he complained that the organizational structure of the school system "defi[ed] all management theory" because there were overlapping responsibilities for financial

matters between himself, Teresa Hill, and consultant David Smith that caused confusion and miscommunication.   In a third, he complained that consultant "David Smith is working in the capacity of an employee and not a contract employee as is stated by his title authority and responsibility."

25.  In other grievances, Weaver accused Dr. Fowler of various instances of wrongdoing, such as giving the appearance of receiving football tickets as a "perk" from a yearbook salesman, sending pornographic and "racial" emails to the plaintiff, allowing Bob Jones High School employees to be paid from local school funds without approval by the Board, and increasing "Ms. Gray['s]" pay by "one step on the salary schedule" contrary to the Separation Agreement under which the Madison City schools separated from the Madison County school system.   In another grievance, he alleged that Dr. Fowler was interfering with and trying to prohibit plaintiff from doing financial consulting work with other school systems.

26.  In another grievance dated June 19, 2007, again received by Dr. Fowler on June 22, 2007, plaintiff alleged that Dr. Fowler failed to comply with the timely processing of his earlier grievances as a "tactic to delay, ignore and let the time pass," contrary to the Board's grievance policy.

27.  Plaintiff met with Dr. Fowler and Board President Sue Helms in July 2007, prior to the July 25 reorganization of the Central Office staff, to discuss his grievances against Fowler.  Helms told him that nothing would be done in response

to his grievances.  Plaintiff replied that he planned to file a USERRA complaint. Helms responded, "Are you threatening me?," to which the plaintiff made no response.  There is no indication that the plaintiff filed a USERRA action prior to the instant action filed on October 4, 2011.

28.  As a result of the July 25, 2007, reorganization, Weaver was named the Chief School Finance Officer and Hill became the Purchasing Agent for the school system.  Hill was not, however, put under plaintiff's supervision, but reported directly to Dr. Fowler, at her request.

29.  As a result of the reorganization, various directors were physically relocated to be nearer the staff they supervised.  Plaintiff was moved from his second-floor office to a first-floor office closer to the business staff. The Director of Transportation was moved to an office in the bus barn, and the Director of Operations was moved to an office in the central office annex building.  The Coordinator of Technology also was moved to the annex building.  Plaintiff's office was located directly beneath the superintendent's office, but it had a less "panoramic" view, overlooking the loading dock.

30.  Dr. Fowler's management style was different from Dr. Clark.  While Dr. Clark preferred individual meetings with staff members, Dr. Fowler held regular weekly staff meetings with multiple staff members present.  Plaintiff participated in these staff meetings.

31.   Prior to his deployment in 2005, plaintiff's position as Executive Director of Finance and Business made him part of the strategic planning for the school system, along with the superintendent and other directors.   One area of responsibility was participation on a committee for capital planning.   Capital planning is the process of assessing and planning for building and facility needs over a long term.   Plaintiff was part of a committee performing capital planning, consisting of him, Dr. Fowler, and the Director of Instruction, Dr. Rizutto. Plaintiff would make student-growth projections, while Dr. Fowler examined faculty needs, and Dr. Rizutto considered instructional requirements.   Plaintiff had no special authority, but simply pooled the available information and organized the meetings of the committee.

32.   During plaintiff's deployment in 2005-2007, David Smith was brought in as a consultant to assist with planning and building a new elementary school. He also advised and assisted Teresa Hill in her role as the Interim Chief School Finance Officer.   Also, the school system began a bond refinance in 2006 and Smith was asked to remain on in 2007 to complete work on the new Mill Creek Elementary School.   Since 2012, Pat Connors took over principal responsibility for facilities planning when he was hired as the Director of Facilities.

33.   Although plaintiff was requested to supply financial data relating to the bond issue, he was not involved in preparing the prospectus, as that was handled

by the bond underwriter and bond counsel, both before and after his military deployment. School bonds were issued through the City of Madison to get a better rate, and this required the use of the City's bond consultant and underwriter. That remains true today. Although prior to 2005 plaintiff had traveled to New York with other school officials for presentations of financial information to bond rating agencies, consultant David Smith did so in the spring of 2009, rather than plaintiff. This appears to be during a time when plaintiff was on military leave from November 2008 to May 2009. (Plaintiff's Ex. 6, "Mobilization 000023"). Weaver still is involved in checking the accuracy of financial information used by the bond underwriter and counsel.

34.   Plaintiff remains involved in long-range strategic planning, although more of that has been taken on by the Board itself. He meets monthly with Board members as part of the Finance Committee, consisting of himself, Dr. Fowler, and two Board members. Similarly, David Smith was involved in financial planning and bond issues in April 2009, June 2009, and August 2009, while plaintiff either was away on active military duty or had returned only shortly before. The same is true of a presentation made by Smith to the Board concerning proration in September 2010—plaintiff was away on active military service.

35.   Although plaintiff had performed salary analyses before his 2005 deployment, when he returned in 2007, David Smith was already performing an

analysis for that year.   In early 2008, plaintiff returned to the salary analysis committee, "but did not lead it."  He also performs staff allocation analyses, but no longer does student projections.

36.  Prior to 2005, as Executive Director of Finance and Business, plaintiff handled the schools system's insurance and investment needs.  As Chief School Finance Officer, he continues to handle insurance issues, but has only limited responsibility for investments.  Most investment questions, however, relate to the school system's bond debt, which is handled by a bond consultant, Johnny Dill, and the bond underwriter, Joe Jolly.  Aside from providing financial data about the school system, plaintiff has never been heavily involved in bond issues or re-finances.  He still supplies financial data as needed by the bond consultant and underwriter.

37.  As was true before 2005, plaintiff remains involved in assisting school principals prepare their budgets.   Weaver also is involved in assessments of personnel allocations (where teachers or staff should be hired or transferred), but he no longer does student projections (estimates about the growth of student populations).

38.  From its founding in 1998, the Madison City school system has more than doubled in size, growing from 4,800 students to over 10,000 today.

39.  Both before 2005 and after 2007, as Chief School Finance Officer, the plaintiff was and is responsible for managing the bidding process and purchases by the school system.  He supervised (and continues to supervise) the business staff of the school system, which has grown in size as the school system has grown. Plaintiff supervises more employees today than he did in 2005.

40.  Although plaintiff received pay raises recommended by Dr. Clark prior to 2005, he has not received a discretionary pay raise since 2007, only those mandated by the State.  He remains the second highest paid employee in the Madison City system, behind only the superintendent.  Plaintiff's Chief School Finance Officer position is not included on the Madison City school system salary schedule because his pay is already much higher than comparable directors, and this pay differential has created a morale issue at times with other employees.

41.  Weaver went on military duty again, in "partial mobilization" for 365 days beginning November 26, 2007, stationed at Redstone Arsenal in Huntsville. He was fully activated to military service again on November 25, 2008, for a period of 365 days; however, he was released from active service on May 25, 2009, after only 182 days.  Accordingly, plaintiff was not available to work at the Madison City school system from November 2007 to May 2009.  Then, in November 2009, plaintiff appears to have been activated for training and deployment preparation during much of November and December, and then fully

activated for service overseas for 400 days on February 14, 2010.  In February of 2011, Weaver was retained in active service in "transition medical retention processing program for completion of medical case and treatment," finally being released from active duty on June 29, 2012.  He had an additional short training assignment from June to September 2012.  On each of these occasions, upon being released from active duty, plaintiff returned to his position as Chief School Finance Officer with the defendant school board.  He continued to be employed in that position as of the time of the trial.

## Conclusions of Law

As mentioned above, the plaintiff asserts two claims under USERRA: (1) that the defendant failure to return him to his former position or an "escalator" position after his deployment in 2005-2007, in violation of § 4312, and (2) the defendant has subjected him to purposeful discrimination due to his military service, in violation of § 4311.  These are based on two "separate and distinct statutory protections."  Coffman v. Chugach Support Services, Inc., 411 F.3d 1231, 1234 (11th Cir. 2005).  While the latter claim requires a showing of an anti-military service animus as a motivating factor in the employer's adverse employment action against the plaintiff, the former does not, simply imposing a

duty, within limitations, of restoring a service member to his or her previous employment upon return from service. Id. at 1235 (11th Cir. 2005).

Title 38 U.S.C. § 4311, as codified since 1994, states:

(a) A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

(b) An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter. The prohibition in this subsection shall apply with respect to a person regardless of whether that person has performed service in the uniformed services.

(c) An employer shall be considered to have engaged in actions prohibited—

(1) under subsection (a), if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service; or

(2) under subsection (b), if the person's (A) action to enforce a protection afforded any person under this chapter, (B) testimony or making of a statement in or in connection with any proceeding under

this chapter, (C) assistance or other participation in an investigation under this chapter, or (D) exercise of a right provided for in this chapter, is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's enforcement action, testimony, statement, assistance, participation, or exercise of a right.

(d) The prohibitions in subsections (a) and (b) shall apply to any position of employment, including a position that is described in section 4312(d)(1)(C) of this title.

Subsection (a) prohibits purposeful employment discrimination "on the basis of that membership [in the uniformed services], application for membership, performance of service, application for service, or obligation."  Subsection (b) prohibits discrimination and retaliation on the basis that a person has invoked, enforced, testified, or assisted in the enforcement of rights under this provision. For purposes of the anti-retaliation provisions of subsection (b), it does not matter whether the employee was a member of the uniformed services; a person who never was in the uniformed services is protected from retaliation in connection with testifying for or assisting someone else vindicating his or her rights under USERRA.  In both instances—employment discrimination and retaliation—the employee must establish as part of his *prima facie* case that "a motivating factor in the employer's action" was either the employee's membership in or service in the uniformed services, or the employee's invocation of rights or assistance to

someone else invoking rights under USERRA.  A motivating factor need not be the only factor at play in an employment decision:

> A motivating factor does not necessarily have to be the sole cause for the employer's decision, but is defined as one of the factors that a truthful employer would list as its reasons for its decision.  [*Coffman v. Chugach Support Services, Inc.*, 411 F.3d 1231, 1238 (11th Cir.2005)].  A court can infer a discriminatory motivation from a variety of considerations, such as: (1) the temporal proximity between the plaintiff's military activity and the adverse employment action; (2) inconsistencies between the proffered reason for the employer's decision and other actions of the employer; (3) an employer's expressed hostility toward members of the protected class combined with its knowledge of the plaintiff's military activity; and (4) disparate treatment of similarly situated employees. *Id.*

Ward v. United Parcel Service, 580 F. App'x 735, 738 (11th Cir. 2014).  The plaintiff bears the initial burden of showing by a preponderance of the evidence that (1) the defendant has denied him "initial employment, reemployment, retention in employment, promotion, or any other benefit of employment," and (2) plaintiff's military service was "'a substantial or motivating factor' in the adverse employment action." Sheehan v. Dep't of the Navy, 240 F.3d 1009, 1013 (Fed.Cir. 2001) (cited with approval in Coffman v. Chugach Support Services, Inc., 411 F.3d 1231, 1234 (11th Cir. 2005)).  Fannin v. United Space All., L.L.C., 2009 WL 139878, at *4 (M.D. Fla. Jan. 20, 2009), aff'd in part sub nom. Fannin v. United Space All., LLC, 392 F. App'x 788 (11th Cir. 2010).

"USERRA's right to reemployment encompasses two guarantees that are embodied in §§ 4312 and 4313. Under § 4312, returning military personnel who (a) gave advance notice of military leave to their employer; (b) were on a military leave of less than five years; and (c) submitted a timely request for reemployment 'shall be entitled' to reemployment.  38 U.S.C. § 4312.  Section 4313 sets forth the position of employment to which the returning veteran must be rehired and requires that the veteran be 'promptly reemployed' in that position."  Fannin v. United Space All., L.L.C., 2009 WL 139878, at *4 (M.D. Fla. Jan. 20, 2009), aff'd in part sub nom. Fannin v. United Space All., LLC, 392 F. App'x 788 (11th Cir. 2010).  Section 4313 provides the order of priority of the positions to which a person entitled to reemployment must be given.  As relevant to this case, it states:

> (a) Subject to subsection (b) (in the case of any employee) and sections 4314 and 4315 (in the case of an employee of the Federal Government), a person entitled to reemployment under section 4312, upon completion of a period of service in the uniformed services, shall be promptly reemployed in a position of employment in accordance with the following order of priority:
>
> * * *
>
> (2) Except as provided in paragraphs (3) and (4), in the case of a person whose period of service in the uniformed services was for more than 90 days—
>
> (A) in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a

position of like seniority, status and pay, the duties of which the person is qualified to perform; or

    (B) in the position of employment in which the person was employed on the date of the commencement of the service in the uniformed services, or a position of like seniority, status and pay, the duties of which the person is qualified to perform, only if the person is not qualified to perform the duties of a position referred to in subparagraph (A) after reasonable efforts by the employer to qualify the person.

* * *

(4) In the case of a person who (A) is not qualified to be employed in (i) the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or (ii) in the position of employment in which such person was employed on the date of the commencement of the service in the uniformed services for any reason (other than disability incurred in, or aggravated during, service in the uniformed services), and (B) cannot become qualified with reasonable efforts by the employer, in any other position which is the nearest approximation to a position referred to first in clause (A)(i) and then in clause (A)(ii) which such person is qualified to perform, with full seniority.

(b)

* * *

    (2) Any person entitled to reemployment under section 4312 who is not reemployed in a position of employment by reason of paragraph (1) shall be entitled to be reemployed as follows:

        (A) Except as provided in subparagraph (B), in any other position of employment referred to in subsection (a)(1) or (a)(2), as the case may be (in the order of priority set out in the applicable subsection), that provides a similar status and pay to a position of employment referred to in paragraph (1) of this subsection, consistent with the circumstances of such person's case, with full seniority.

\* \* \*

39 U.S.C. § 4313.[2]   The order of priority reflects the so-called "escalator principle."   Under § 4313(a)(2)(A), this requires, first, that the returning service member be "reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of [military] service," 20 C.F.R. § 1002.191, or "a position of like seniority, status and pay, the duties of which the person is qualified to perform."   See Fannin, supra, at \*6 (M.D. Fla. Jan. 20, 2009).   Second, only if the returning employee is not qualified to perform the escalator job, he must be reemployed in the position he held at the time he left for military service under § 4313(a)(2)(B).   Third, if the returning employee is not qualified to perform either the escalator position (§ 4313(a)(2)(A)) or the position he held at the time he left for military service (§ 4313(a)(2)(B)), and he cannot be made qualified for these positions after "reasonable efforts by the employer," he must be employed "in any other position which is the nearest approximation to" the escalator position or his former position.   See 38 U.S.C. § 4313(a)(4).   The burden of proving that the returning employee is not qualified for a position rests on the employer, not the

---

[2]   Omitted are provisions inapplicable to this case, dealing with service members absent from employment for less than 90 days and service members with a disability, neither of which is implicated in the facts of this case.

employee.  Fannin, at *6; Petty v. Metropolitan Government of Ashville–Davidson County, 538 F.3d 431, 444 (6th Cir. 2008).

The "escalator" principle is designed to assure service members that their temporary military service (of less than five years) does not disadvantage them in the advancement of their civilian careers.  Upon returning from military service, the employee is entitled to be placed in the position he would have attained "with reasonable certainty" if he remained continuously employed with no interruption due to military service.  Citing Fishgold v. Sullivan Drydock & Repair Corp, 328 U.S. 275, 284-85, 66 Sup. Ct. 1105, 90 L. Ed. 1230 (1946), the Fannin court explained:

> USERRA's regulations explain that this "escalator position" means that "the employee is entitled to reemployment in the job position that he or she would have attained with reasonable certainty if not for the absence due to uniformed service," i.e., reemploying the servicemember "in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of service," 20 C.F.R. § 1002.191.  The Supreme Court has described the escalator principle as protecting a servicemember "against receiving a job inferior to that which he had before entering the armed services," *Fishgold*, 328 U.S. at 284.

Fannin v. United Space All., L.L.C., 2009 WL 139878, at *8 (M.D. Fla. Jan. 20, 2009), aff'd in part sub nom. Fannin v. United Space All., LLC, 392 F. App'x 788 (11th Cir. 2010).

Nevertheless, USERRA accommodates the fact that workplaces are dynamic and not static; changes occur over time that impact the positions to which service members are entitled to reemployment.  As the court in Fannin explained:

> [A]n employer is permitted to take into consideration changes in the workplace during an employee's period of military leave.  The USERRA regulations recognize that an employer's reemployment offer may be affected by changes in staffing or work priorities, so long as the returning employee maintains the seniority and job classification he would have held if he had been employed during his period of military service.  *See* 20 C.F.R. § 1002.194 ("The reemployment position may involve transfer to another shift or location, more or less strenuous working conditions, or changed opportunities for advancement, depending upon the application of the escalator principle.").

Fannin v. United Space All., L.L.C., 2009 WL 139878, at *6 (M.D. Fla. Jan. 20, 2009), aff'd in part sub nom. Fannin v. United Space All., LLC, 392 F. App'x 788 (11th Cir. 2010).

### A.  Plaintiff's Reemployment Claim under §§ 4312 and 4313

Plaintiff's first claim for relief alleges that, upon his return from military deployment in February 2007, he was not reemployed to either the "escalator" position or his former position as Executive Director of Finance and Business. Because the evidence is clear that he returned to work at the Madison City school system with the title of Executive Director of Finance and Business and at the same rate of pay as when he left, his argument centers on the assertion that he was

not returned *also* to the position of Chief School Finance Officer and that some of his previous duties and responsibilities as Executive Director of Finance and Business had been assumed by other employees of the Board.

When plaintiff left to go on active military duty in September 2005, his official job title was Executive Director of Finance and Business, the same as it had been since the execution of his employment contract in 1998.  In 2003, the defendant Board certified to the Alabama State Department of Education that plaintiff also was the Board's Chief School Finance Officer, pursuant to regulations enacted by the State Board.  There is no indication in the evidence, however, that the essential nature of the plaintiff's job duties or responsibilities changed upon being certified as the Chief School Finance Officer in 2003.  There has been no showing that, upon being so certified, he received new or additional job responsibilities or an increase in pay attributable to the new designation.[3]  That designation was not understood by either the Board or the plaintiff as creating a new job or job classification at the time it occurred.  Rather, it appears that all parties believed that the designation was subsumed within the plaintiff's job as the Executive Director of Finance and Business.  By his own testimony, plaintiff already was charged with overseeing anything to do with the financial and business

---

[3]   While plaintiff received pay increases between the time of the designation in 2003 and his military leave in 2005, these were discretionary.  There is no evidence that any post-2003 pay increase was due to plaintiff's designation as the Chief School Finance Officer.

aspects of the school system.   He has presented no evidence that his 2003 designation as the Chief School Finance Officer added any new specific duties that were identifiably distinct from those associated with the position of Executive Director of Finance and Business.

When plaintiff returned to work in February 2007, Teresa Hill held the title of Interim Chief School Finance Officer, while plaintiff retained his previous title of Executive Director of Finance and Business.   Plaintiff retained the same rate of pay he received when he left for service in 2005; he did not suffer a pay decrease or loss of benefits.[4]   Given that plaintiff was the second highest paid employee of the Madison City schools, behind only the superintendent, there is no "reasonable certainty" that plaintiff could have or would have attained an even higher escalator position but for his military service. Except for the superintendent and assistant superintendent positions,[5] there was no higher position in the school system's organization to which he could have "escalated."   Plaintiff already was the chief Board officer in charge of financial planning, budgets, purchases, insurance, and investments.

---

[4]   There was some scant evidence, though not emphasized by anyone, that for a while after his return, Dr. Fowler and the Board did not pay for insurance on Weaver's automobile, as required in his 1998 employment contract.  This appears to have been resolved when the Board agreed to continue paying the insurance in the spring of 2007.   There is no other evidence of lost employment benefits.

[5]   Plaintiff has not asserted that he was qualified to be either the superintendent or the assistant superintendent.   In any event, there is no "reasonable certainty" that, but for his military service from 2005 to 2007, he was have risen to either of these positions.

The essence of the plaintiff's reemployment claim is that, upon his return, he was *demoted* because he was not reemployed as *both* the Executive Director of Finance and Business *and* the Chief School Finance Officer.  He contends these were separate and distinct positions, but the evidence of this is mixed and complicated.  On the one hand, it is true that he held one position and Teresa Hill held the other, but the split came about because of the enactment of the School Fiscal Responsibility Act of 2006 (while plaintiff was on leave), which created the formal position of Chief School Finance Officer as a statutory job classification. Prior to 2006, State Board of Education regulations required that someone had to be certified (that is, specially trained and qualified) to be the Chief School Finance Officer, but there was no requirement that it be established as a separate and unique position.  Anyone but the superintendent could be designated the Chief School Finance Officer.[6]  It was only with the passage of the School Fiscal Responsibility Act in 2006 did Alabama *statutory* law require the creation of a separate post for the Chief School Finance Officer.  That same statute vested new responsibilities in the position, including a direct fiduciary reporting responsibility to the Board.  Plaintiff never held *that* statutorily-mandated position prior to 2007.

---

[6]  The "Summary--Chief School Finance Officers" attached to the June 2003 memorandum from Robert Morton at the State Board of Education made clear that, "The chief school finance officer does not  have to be the custodian  of school funds, chief accountant, finance director, or head bookkeeper.  The school board can name any qualified employee or officer of the school system (except the superintendent) as the chief school finance officer, if the individual is responsible for the financial management system of the board."  See Plaintiff's Ex. 16.  In 2003, that person was the plaintiff.

It is simply not true that the Chief School Finance Officer position created by statute in 2006 was the same as that designation held by plaintiff under State Board regulations prior to his deployment in 2005.  It was markedly different in authority and responsibility after 2006.  It had to be a separate job position, not simply part of the duties of another position.  The statutory Chief School Finance Officer was hired directly by the school board, without a recommendation from the superintendent, and it had a fiduciary duty to report directly to the school board.  Because the plaintiff never held *this* statutory position, he was not automatically entitled to be reemployed in it.

Even if it can be asserted that the statutory Chief School Finance Officer position, described by the defendant Board as the preeminent finance and business job in a school system, was the "escalator" job to which plaintiff was due "prompt" reemployment in February 2007, he has suffered no injury due to the delay in naming him to the post.  It is true that the plaintiff was not designated to be the Chief School Finance Officer until July 2007, when Dr. Fowler's reorganization plan was adopted by the Board.  But Weaver lost no pay or other compensation due to the delay in making him the Chief School Finance Officer.  When he returned in February 2007, he was being paid much more than Hill was being paid as the Interim Chief Finance Officer.  By the end of July 2007, upon completion of the reorganization of the Madison City school system, plaintiff became the Chief

School Finance Officer for the system at the same rate of pay and with the same benefits he was previously receiving. His former position as Executive Director of Finance and Business was eliminated in the reorganization (as were other former positions in the system) and he became the Chief School Finance Officer, but it resulted in no loss or diminution of pay or benefits.

The remedies provided for a violation of USERRA are limited. Section 4323(d) provides:

> **(d) Remedies**.--(1) In any action under this section, the court may award relief as follows:
>
> **(A)** The court may require the employer to comply with the provisions of this chapter.
>
> **(B)** The court may require the employer to compensate the person for any loss of wages or benefits suffered by reason of such employer's failure to comply with the provisions of this chapter.
>
> **(C)** The court may require the employer to pay the person an amount equal to the amount referred to in subparagraph (B) as liquidated damages, if the court determines that the employer's failure to comply with the provisions of this chapter was willful.

As the Eleventh Circuit has explained, "USERRA provides that a court may award three kinds of relief: (1) an injunction requiring an employer to comply with USERRA's provisions; (2) compensation for lost wages or benefits suffered by reason of the employer's failure to comply with USERRA, and (3) liquidated damages in an amount equal to lost wages or benefits if the employer's failure to

comply with USERRA was willful." Dees v. Hyundai Motor Mfg. Alabama, LLC, 368 F. App'x 49, 52–53 (11th Cir. 2010). At least with respect to the delay from February to July 2007 before plaintiff was reemployed as the Chief School Finance Officer, any injunctive relief is moot, as he now holds that position. He suffered no loss of pay, as he continued to be paid at the same higher rate as before his deployment than Hill was being paid, and there is no evidentiary basis for finding a "reasonable certainty" that his pay would increase upon being placed in the new Chief School Finance Officer position.[7] Because he lost no pay due to the delay in assigning him to that position, he is not entitled to liquidated damages.

To the extent Weaver contends that the elimination of his former position of Executive Director of Finance and Business amounted to a failure to reemploy him as required by § 4313,[8] nothing in USERRA prevents an organization from restructuring itself. Congress did not intend USERRA to vest employees with a lifelong entitlement to a particular employment position, regardless of the growth, changes, and needs of the employer. When Dr. Fowler assumed the position of

---

[7]   As will be discussed in more detail later in his Memorandum Opinion, it cannot be said that plaintiff with "reasonable certainty" was entitled to pay increases upon his return to employment. Prior to 2005, plaintiff was not on any Board salary schedule (one did not exist) and his pay raises were based on the discretionary recommendations of Dr. Clark. In 2006, at the end of Dr. Clark's administration, the Board ceased its practice of discretionary raises, opting to develop a salary schedule. As a result, there was no expectation with "reasonable certainty" of continuing to receive the raises like those formerly awarded by Dr. Clark.

[8]   Weaver also asserts that this was discriminatory in violation of § 4311. The court will discuss that potential claim later in this memorandum opinion.

superintendent on January 1, 2007, only a month before the plaintiff's return to work, he started the process of overhauling and reorganizing the Madison City school system.  Fowler and Weaver both testified that in the last months of his administration, Dr. Clark became "disengaged" from leadership of the system, resulting in tension among the staff and a malaise and decline in the system itself. To change that direction, Dr. Fowler planned to reorganize the system and give it a new sense of direction.  This came during a time when the school system was growing rapidly, with a new elementary school being planned.  The evidence reflects that the process of restructuring began almost immediately.  Indeed, in the very email in which Dr. Fowler announced Weaver's return to work, he mentioned the ongoing planning for the reorganization and asked for the patience of the staff until it could be completed.  That effort culminated in the Board's July 25, 2007, approval of Dr. Fowler's reorganization plan, under which plaintiff was assigned the new statutory position of Chief School Finance Officer.  Not surprisingly, some job duties and responsibilities of several senior staff were redirected and redistributed to new employees as part of the reorganization.

Plaintiff Weaver's complaint that he no longer performs some of the duties he performed under Dr. Clark does not mean that his position as Chief School Finance Officer was not a position of "like seniority, status and pay" to that he formerly held.  His pay remained unchanged, not reduced.  His employment

benefits remained the same.  He remained then and today second only to the superintendent in importance when it comes to financial matters for the system. He meets monthly with the Finance Committee; he is a participant on the Capital Planning Committee; and his basic duties with respect to insurance, bond issues, and budgets remain essentially unchanged.  Because of his high position in the system hierarchy, seniority does not impact his career advancement.[9]  His complaint that he no longer meets one-to-one with the superintendent reflects nothing more than the different management style of Dr. Fowler, who holds regular staff meetings rather than individual meetings with staff.  Certainly, USERRA's reemployment right does not entitle the employee to insist on a particular management style or relationship as indicia of the proper reemployment position.  To the extent there are some duties he no longer performs, it is the natural result of the growth of the school system from 4,800 students in 1998 to almost 10,000 in 2016.  Such growth requires the system to divide administrative responsibilities among more employees with greater and greater specialization. The evidence suggests that Weaver continues to be the lead employee responsible for financial planning, budgets, and accounting.  He certainly is the highest ranking employee (under the superintendent) for financial matters, with a direct fiduciary reporting responsibility to the Board independent of the superintendent.  Again, the

---

[9]  In any event, no one disputes that he is *the* most senior employee, in terms of length of service, in the system today.

USERRA reemployment right does not require that an employee's job duties and responsibilities remain unchanged regardless of the needs of the employer or changes in the workplace. The employee's right to reemployment is not the right to insist that his job forever remain the same. The court is unpersuaded that Weaver's assignment to the position of Chief School Finance Officer failed to meet the USERRA requirement that he be reemployed in a position of like pay, status, and seniority as he could have expected with reasonable certainty to hold.

B. Plaintiff's Discrimination Claim under § 4311

Plaintiff's second claim, alleged pursuant to § 4311, is that the Board has actively discriminated against him due to his military service. He alleges that the Board demoted him upon his return from active service in 2007 by not recognizing him as *both* the Executive Director of Finance and Business *and* the Chief School Finance Officer. He alleges that the Board has discriminatorily reduced his status within the system by removing some of his prior responsibilities, excluding him from certain activities, and assigning him to an office on the first floor of the school system's central office building. And, finally, he alleges that the Board has discriminatorily denied him pay raises since 2007.

To make out a *prima facie* case of § 4311 discrimination, the plaintiff must prove by a preponderance of the evidence that the actions taken by the Board were the product of purposeful discrimination due to his military service. "Section 4311

clearly mandates proof of discriminatory motive…. The standard of proof is the so-called 'but for' test."  Coffman v. Chugach Support Services, Inc., 411 F.3d 1231, 1238 (11th Cir. 2005), citing Sheehan v. Dep't of the Navy, 240 F.3d 1009, 1013 (Fed. Cir. 2001); Brandsasse v. City of Suffolk, Va., 72 F.Supp.2d 608, 616–17 (E.D.Va. 1999); see also Landolfi v. City of Melbourne, Fla., 515 F. App'x 832, 834 (11th Cir. 2013) ("Section 4311 requires proof of a discriminatory motive, and we employ the so called 'but for' test.").  The Eleventh Circuit has written:

> According to the statutory context above, we have held that the plaintiff must first establish a *prima facie* case of discrimination by showing, by a preponderance of evidence, that his protected status was a "motivating factor" in the employer's adverse employment decision. *Coffman* [*v. Chugach Support Services, Inc.*, 411 F.3d 1231, 1238 (11th Cir.2005)].  "A motivating factor does not mean that it had to be the sole cause of the employment action," but it has to be one of the factors that the employer "relied on, took into account, considered, or conditioned its decision on that consideration." *Id.* (quotation and citation omitted).  After the plaintiff meets the initial burden, the burden shifts to the employer to prove, by a preponderance of evidence, the affirmative defense that "legitimate reasons, standing alone, would have induced the employer to take the same adverse action." *Id.* at 1238-39 (citation omitted).

Gambrill v. Cullman County Bd. of Educ., 395 F. App'x 543, 544 (11th Cir. 2010).  Quoting from the Federal Circuit's opinion in Sheehan, *supra*, the Eleventh Circuit explained in Coffman that the burden-shifting standard of proof applies even in so-called "dual motive" cases.  For example:

"When the employee has met this burden, the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." *Id.* This burden-shifting framework "applies to both so-called 'dual motive' cases and so-called 'pretext' cases." *Id.* "Thus in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the agency action, upon which the agency must prove, by a preponderance of evidence, that the action would have been taken despite the protected status."

Coffman v. Chugach Support Services, Inc., 411 F.3d 1231, 1238–39 (11th Cir. 2005), quoting Sheehan v. Dep't of the Navy, 240 F.3d 1009, 1014 (Fed. Cir. 2001).

A discriminatory motive may be shown by direct or circumstantial evidence. Circumstantial evidence may include inferences from the following types of evidence:

A court can infer a discriminatory motivation from a variety of considerations, such as: (1) the temporal proximity between the plaintiff's military activity and the adverse employment action; (2) inconsistencies between the proffered reason for the employer's decision and other actions of the employer; (3) an employer's expressed hostility towards members of the protected class combined with its knowledge of the plaintiff's military activity; and (4) disparate treatment of similarly situated employees.

Landolfi v. City of Melbourne, Fla., 515 F. App'x 832, 834 (11th Cir. 2013), citing Coffman v. Chugach Support Services, Inc., 411 F.3d 1231, 1238 (11th Cir. 2005).

If plaintiff carries the initial burden of proof, the employer may then attempt to prove the affirmative defense "that legitimate reasons, standing alone, would have induced it to take the same adverse action." Id. at 835.

Applying these standards, the court finds that the plaintiff has not shown by a preponderance of the evidence that his military service was a motivating factor in the various employment decisions made by the Board.  Although the evidence is persuasive that, in late 2006, as Weaver prepared to return to work following his active deployment, Dr. Nowlin, the interim superintendent, Sue Helms, the Board president, and Woody Sanderson, the Board Attorney, all urged Weaver not to extend his deployment and told him that the Board was concerned with having to pay the difference between his Board salary and his military pay, this evidence ultimately fails to prove that his military service was a motivating factor in any Board decision related to him.  First, this evidence clearly demonstrates that the Board and school officials *wanted* the plaintiff to return to work at the Madison City schools.  They urged the plaintiff not to extend his active-duty deployment, and plaintiff successfully obtained his release from active duty without an extension.  Because Board and school officials got what they wanted, they had no reason to be hostile to the plaintiff due to his military service.  The court does not believe that Board and school officials would urge plaintiff not to extend his deployment and to come back to work, only then to hold it against him in a

discriminatory manner when he complied with their wishes.  It makes no sense for them to actively recruit his return to work if they wanted to discriminate against him for his military service.  The fact that they were concerned with having to pay the difference between his Board pay and his military pay does not mean that they viewed his military service as a negative factor.  Rather, they valued his return to work and urged him to return as soon as possible, which also resolved their pay differential concern.

If there was any reason for Dr. Fowler and the Board to harbor a negative animus against Weaver, it was not due to his military service, but to the grievances filed against him in 2005 before he left on deployment.  Weaver's own actions had engendered a significant amount to ill will toward him.   Board employees perceived him to have been unfairly favored by Dr. Clark and, perhaps even that Weaver had manipulated Dr. Clark into giving him significant pay raises before 2005.  There was credible testimony that Weaver told Dr. Fowler that the reason he was not on a salary schedule was that he got better raises based on recommendations by Dr. Clark.  The fact that he was the second highest paid employee of the Board by a significant margin created morale problems.  On top of that, multiple grievances were filed against Weaver in 2005, alleging sexual harassment (that resulted in a monetary settlement to the complaining employee), abusive treatment, and irregular work hours.  The Board disciplined him with a

seven-day suspension without pay and a formal written reprimand, all occurring only weeks before he left in 2005.  It was not Weaver's military service that left a bad feeling with the Board; it was his misconduct as an employee.  If there was reason to reconfigure Weaver's job duties or to carefully consider his position in the reorganization of the school system's structure, it was these events, not his military service.

Plaintiff argues that when he accepted the Board's discipline, he was told that it would be finished when he completed his anger-management counseling in the fall of 2006.  Even so, Board management had to remain alert to personnel changes needed to reduce tensions caused by Weaver.  For example, Teresa Hill, one of the employees who filed a grievance against the plaintiff in 2005, requested that she not be required to report to Weaver as her supervisor when he returned in 2007.  Tensions continued to simmer notwithstanding the disciplinary agreement, and management of those tensions required some reassignment of personnel and duties.

Also, plaintiff's influence over the school system's affairs waned for the separate reason that Dr. Clark retired.  The testimony is clear that Dr. Clark relied heavily in the plaintiff to perform many duties not directly related to his position as Executive Director of Finance and Business.  Student-growth projections, for example, seem to have only tangential relevance to finance and business matters.

When Dr. Clark became "disengaged" and then retired in 2006, Weaver's influence was reduced by the simple fact that a new superintendent would have a different management style and a different relationship with him. This waning of his influence and status had little to do with his military service and much more to do with inevitable changes occurring in the workplace.

Finally, the fact that the Board chose not to put the plaintiff on a salary schedule was not motivated by Weaver's military service, but by the fact that he was already being paid disproportionately higher that other comparable employees due to the raises he received under Dr. Clark. A morale problem existed among Board employees because plaintiff was being paid significantly more than comparable employees at the Director level. The court finds that the Board concluded that plaintiff's pay was out of line with other employees and should be capped. Even if Weaver had been placed on the salary schedule, as he now argues, his pay already exceeded the upper limits of pay for the Director classification, essentially meaning that he had topped out. This was not motivated by his military service, but by his disproportionately high pay.

Based on these findings, the court concludes that the plaintiff has not shown by a preponderance of the evidence that the Board was motivated by his military service to discriminate against him. But in the alternative, the plaintiff also has failed to show that he suffered an adverse employment action as a result of the

alleged discrimination based on his military service.  To make a *prima facie* case under USERRA, the plaintiff must prove that an anti-military animus was a motivating factor underlying an "adverse employment action" by the employer. See Gambrill v. Cullman County Bd. of Educ., 395 F. App'x 543, 544 (11th Cir. 2010) ("An employer violates the USERRA if the applicant's membership in a uniformed service is a "motivating factor" in the employer's adverse employment action…."); Dees v. Hyundai Motor Mfg. Alabama, LLC, 368 F. App'x 49, 51 (11th Cir. 2010) (discussing the "cat's paw" theory as a method for proving a discriminatory animus underlying an "adverse employment action").  Supreme Court and Eleventh Circuit precedent imported into the USERRA context from other areas of law prohibiting employment discrimination explain that an "adverse employment action" is one that results in a "serious and material change" in the employee's status, such as a loss of employment or pay, or a reassignment to significantly different job responsibilities.  See Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761–62, 118 S. Ct. 2257, 2268–69, 141 L. Ed. 2d 633 (1998); Crawford v. Carroll, 529 F.3d 961, 970-971 (11th Cir. 2008); Ward v. United Parcel Service, 987 F. Supp. 2d 1240, 1262 (N.D. Ala. 2013), aff'd, 580 F. App'x 735 (11th Cir. 2014).  In this case, plaintiff suffered no loss of pay,[10] he

---

[10]    Perhaps the strongest argument the plaintiff has for establishing a tangible adverse employment action is that he has not received a pay raise (except for across-the-board state mandated raises) since 2007, but plaintiff is not able to show any entitlement to a pay raise.

retained his job, and was not reassigned to significantly different duties.  There is no substantial evidence that the plaintiff suffered an adverse employment action due to USERRA discrimination.  He has continued to retain the same job, the same pay, and substantially the same duties throughout his employment with the Board.[11]

Alternatively, even if the plaintiff's military service was a factor considered by the Board at some point during its decisions related to him (but the court does not believe it was) and that factor resulted in an "adverse employment action" against the plaintiff, the Board has carried its burden of showing by a preponderance of the evidence that it would have made the same decisions regardless of the plaintiff's military service.  The evidence shows that, when Dr. Clark retired in 2006 and Dr. Fowler was selected as the next superintendent, Dr. Fowler and the Board embarked on a plan to re-energize the school system by reorganizing it and setting up a standard, predictable, and impartial step-based salary schedule.  The reorganization took into account the newly-created statutory

---

Neither his individual contract nor the salary schedules put in place awarded him any set or regular pay raises.  All of his raises were discretionary.  The Board ended its practice of awarding discretionary raises in 2006.  Because plaintiff's pay already exceeded the maximum provided by the salary schedules adopted by the Board, he would not be entitled to raises under the schedules.  He had no reasonable certainty of receiving any pay raises.

[11]   The plaintiff's 2005 suspension and reprimand, while certainly an "adverse employment action," was not motivated by an anti-military animus.  Plaintiff received the discipline in July 2005, but was not notified of his activation to duty until August 2005.  There is no causal link between the discipline and his military service, and the plaintiff has not attempted to argue one.

position of Chief School Finance Officer, which was viewed by the Board as the preeminent staff position for business and financial matters.  Other duties not directly related to financial planning, such as facilities planning and construction, student-growth projections, and technology assessments, were assigned to other employees or to consultant David Smith on a temporary basis until new positions on the organizational chart could be filled.  This was not based on plaintiff's military service, but on the need of the school system to evolve and delegate work to specialized employees as it grew in size.  Unlike the early days of the system in 1998, the Madison City Schools had grown to the point in 2007 that plaintiff simply could not (and should not) perform all of the responsibilities that Dr. Clark expected of him originally.  Those duties were appropriately distributed among several other more-specialized employees.

As part of the reorganization, Dr. Fowler wanted to create a rational, step-based salary schedule that put peer employees on the same levels of pay.  Because plaintiff's compensation was disproportionately higher than his peer co-workers and because he was (and is) employed on an individual contract,[12] Weaver's Chief School Finance Officer position was not included on the salary schedule.  The

---

[12]  It can be argued that the statutorily-mandated Chief School Finance Officer created in 2006 is a unique employee that does not fit any category on a salary schedule.  The CSFO is hired directly by the Board of Education and has a fiduciary reporting duty that runs directly to the Board.  The CSFO is one of only two employees (the other being the superintendent) who work on contract.

Board and Dr. Fowler plainly considered Weaver's peer employees to be other "directors" identified on the organizational chart. Despite receiving only state-mandated pay raises since 2007, the plaintiff remains the second highest paid employee of the Board. His pay is higher than a comparable director who has topped out on the salary schedule.[13] The defendant Board has proven by a preponderance of the evidence that Weaver's compensation is disproportionately out of line with peer directors. The Board has taken steps to reduce the disproportionality by capping his pay and bringing it closer into line with other directors. The Board has proven it would have made this decision regardless of the plaintiff's military service.

## Conclusion

The court finds that the plaintiff has failed to prove either of his claims by a preponderance of the evidence. Under § 4313, plaintiff has been employed in a position of comparable status, pay, and seniority to the position he held before his 2005-2007 military leave. There is no higher "escalator" position which he might

---

[13]   For example, Plaintiff's Exs. 48 and 49 are the Madison City Schools Board of Education salary schedules for school years 2014-2015 and 2015-2016. Both show the top-end base pay for a Step 15 director to be $114,810.00, or more than $27,000 per year less than Weaver's pay of approximately $141,000.00 per year. Dr. Fowler testified that he believed that high school principals should be the highest paid employees of the Board, with directors as the next highest paid classification. Under these salary schedules, a topped-out high school principal with all incentives would make about $127,000.00 per year, or about $14,000.00 per year less than the plaintiff's compensation. Even an assistant superintendent would have to reach Step 8 to equal the plaintiff's current pay.

have attained with a reasonable certainty.  His position as the Chief School Finance Officer was comparable to his former position as the Executive Director of Finance and Business, even if some of his former duties were reassigned to other employees as part of the Board's reorganization of the school system staff.  The Chief School Finance Officer, as created by statute in 2006, is the highest school official charged with financial matters, and Weaver has lost no pay or employment benefits as a result of his assignment to the position.  He was appropriately reemployed by the Board upon his return from service in 2007.

Additionally, the plaintiff has failed to prove by a preponderance of the evidence that the Board subjected him to employment-related discrimination due to his military service.  It seems incongruous to the court that the Board would urge him to return to work as soon as possible, but then, according to plaintiff's theory, embark on a series of discriminatory actions against him due to his military service.  He has remained employed as the Madison City Schools' Chief School Finance Officer since July 2007, despite at least two other extended military deployments.  His pay has not been reduced, and any change in his day-to-day job duties is either *de minimis* or the result of the natural growth and evolution of the school system.  Plaintiff has not shown that Board decisions made about his employment involved any anti-military motivating factor or that he suffered a tangible adverse employment action.  Alternatively, the court finds that the Board

has carried its burden of proving that it would have made the same decisions regardless of the plaintiff's military service.

The court will enter a separate judgment in favor of the defendant.

DONE this 13th day of December, 2016.


_____

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE